UNITED STATES, Appellee

v

ELMER C. ROBINSON, Private First Class,
U. S. Army, Appellant

6 USCMA 347, 20 CMR 63

348

No. 6490

Decided September 16, 1955.

First Lieutenant Leslie D. Scharf argued the cause for Appellant, Accused. With him on the brief were Lieutenant Colonel Jackson K. Judy, Lieutenant Colonel Edward Duvall, and Captain Albert C. Malone, Jr.

Lieutenant Colonel Andrew D. Kane argued the cause for Appellee, United States. With him on the brief were Lieutenant Colonel Thomas J. Newton, Major Clayton B. Tasker, and First Lieutenant Edward S. Nelson.

## Opinion of the Court

GEORGE W. LATIMER, Judge:

### I

While assigned as a cook's helper in the officers' mess at Fort Leslie J. McNair, Washington, D. C., the accused was charged with willful disobedience of a lawful command of his superior officer, in violation of Article 90, Uniform Code of Military Justice, 50 USC § 684. As several defenses to the specification, he asserted that he was physically unable to comply and that his assignment to the particular duty was illegal and, therefore, the order given was without validity. The general court-martial which heard the case found otherwise, and after returning a finding of guilty, sentenced him to a bad-conduct discharge, total forfeitures, and confinement at hard labor for nine months. The convening authority and an Army board of review have affirmed the findings and sentence. In response to the accused's petition, we granted review on the following two questions:

1. Was the accused legally assigned to the Officers' Mess?

2. Was the evidence sufficient to establish that he was a volunteer?

### II

The significant facts are these: Sometime prior to October 7, 1954, the accused became dissatisfied with his assignment as a cook at his unit mess. At the request of his commanding officer, he was interviewed at the Post Classification and Assignment Section for detail to an assignment where his military occupational specialty might be used.

349

On that occasion, he was recommended for assignment to the Post Officers' Open Mess by both the section chief and the personnel sergeant major, and he was then interviewed by Captain Hagood, the Post Military Personnel Officer. Captain Hagood discussed with the accused his occupational background, the cooking experience he had had in his prior positions, and his preference with respect to further assignment on the Post as an alternative to being assigned to a different station. The Captain also discussed with him a vacancy as a cook's helper at the Officers' Mess and offered him that position, making the offer contingent upon accused's desires. The accused assured Captain Hagood that he was eager to remain on the Post and was very agreeable to the proffered assignment. Thereupon, he was dispatched to the Officers' Mess, interviewed, found acceptable by Captain Wilson, the Mess Officer, and assigned accordingly.

The accused soon became dissatisfied with his new job. At the grade he held, his military occupational specialty was that of cook's helper, and, although he was given a trial as a cook, it soon appeared that he was not sufficiently skilled to meet the competition in the Officers' Mess. Consequently, he was assigned to the less demanding tasks for which he was qualified and presumably he performed them uneventfully for a short time. On October 12, 1954, he failed to appear for work on time, and after he finally appeared, he refused to obey a direct order from the mess officer to perform his duties, claiming that he was sick. It was that refusal which led to the charges before us.

### III

With respect to the first granted issue, appellate defense counsel advance two arguments, either of which, it is claimed, demonstrates the illegality of the order which the accused disobeyed. It is first contended that 10 USC § 608 prohibits the use of enlisted men in an officers' open mess. That statute reads:

"*Officers using enlisted men as servants.* No officer shall use an enlisted

man as a servant in any case whatever."

A search of the Federal statutes discloses that the above-quoted law is derived ultimately from the Act of July 15, 1870, chapter 294, § 14, 16 Stat 319, which uses language to the same effect. Whether that statute bars the assignment of enlisted men as workers in officers' open messes is not a novel question, but it is doubtful that the interpretations found in the early cases offer persuasive authority for a present day construction.

In 1909, the United States Court of Claims, in Williams v. United States, 44 Ct Cl 175, passed on the right of an officer to recover an amount of money which he had been required to return to the Treasury of the United States. The facts in that case were these. Certain enlisted men of the Navy, who had enlisted as mess attendants afloat, were detailed for mess duty at an officers' voluntary mess on shore. They were subsisted by the mess and the money due the men in lieu of subsistence was paid to the mess fund. The Government made a demand for the return of the money diverted to the fund, and the officer was required to contribute his proportionate part of the amount which had to be repaid. By his action before the Court of Claims he sought to recover the amount of his contribution. In the course of its holding that Court stated that Revised Statutes 1232, the immediate predecessor of 10 USC § 608, prohibited the diversion of mess attendants enlisted to serve aboard ship from that assignment to an officers' open mess on shore.

In 1918, The Judge Advocate General of the Army held that soldiers could not be detailed as servants or waiters for an officers' open mess, and cited the Williams case as authority for the holding. Dig Op JAG, 1912–1940, § 202, 220–6, November 1, 1918. Another holding to the same effect followed three years later, CM 146727 (1921). The following language from Dig Op JAG, 1912–1940, § 422(6) illustrates the interpretation given to Revised Statutes 1232 by The Judge Advocate General of the Army in the last-mentioned case:

"An order by a superior officer to an enlisted man to wait on table at an officers' mess is in contravention of R. S. 1232, which provides that 'no officer shall use an enlisted man as a servant in any case whatsoever.' Such an order is, therefore, illegal and cannot be made the basis for a conviction of willful disobedience under A. W. 64."

Under the strained manpower conditions of World War II, a different approach was taken to the problem, and although the statute remained unchanged, an interpretation more in accord with our views of the intent of Congress, was announced. In United States v. Semioli, 53 BR 65, a board of review rationalized that the prohibition intended by Congress was to be determined by the object of the employment, that is, whether the employment was a military task beneficial to the Army, or a personal service rendered to an individual officer or group of officers. That theory appears to have been recognized partially in War Department Circular 214, July 2, 1942, which provided that enlisted attendants could be employed in officers' messes when the post, camp, or station commander determined that it was impracticable to employ qualified civilian personnel. SPJGA 1945/3653, April 26, 1945. A further departure from the earlier interpretation appears in SR 210–60–1, dated December 7, 1948, and Letter JAGA 1952/8214, October 31, 1952, which provide that where special problems exist and certain requirements are met, enlisted personnel can be detailed to work in officers' open messes if they volunteer for the assignment. However, the authorities are not unanimous on the legality of the employment, as the views found in United States v Shields, 32 BR 149, and Letter, JAG Army, SPJGJ 1945/3039, March 14, 1945, follow the earlier interpretation.

In spite of the drift away from the earlier holdings marked by the present day regulation, which conditions assignment upon the consent of the enlisted men concerned, we cannot escape the necessity of determining the intent of Congress as it is expressed in the present-day statute. This is so because it appears to us that if 10 USC § 608 must be interpreted to prohibit the use of enlisted men in officers' messes, then the matter of consent is immaterial. Certainly we do not believe that an enlisted man can volunteer to violate a Federal statute and thereby cloak the proscribed act with legality.

We have at times given great weight to the contemporaneous construction of a statute by those departments of Government which have a duty to administer the law. They offer helpful guideposts to the intent of Congress, but although they are entitled to great weight, they are not conclusive, and we are not compelled to adopt them as the law of this Court. More so is that true when national conditions and the necessities of the Service have changed to such an extent that to follow the early interpretations would unnecessarily interfere with the building of an armed force capable of carrying out present day missions. Perhaps, prior to World War II, it was not necessary to the administration and training of an Army to maintain open officers' messes. Facilities which were adequate to permit the education, training, and effective use of 4,604 officers in 1912 or 13,304 officers in 1938, would be woefully inadequate to accomplish those requirements for the 128,208 officers presently in the Army. We need only to suggest that the movement of personnel has accelerated, temporary duty and detached service assignments have increased, attendance at service schools has been multiplied and the short-term conference concept is now widely utilized. We can take cognizance of the fact that both the Industrial College and the War College are situated at Fort McNair. In addition, many conferences of military and civilian persons who are directly connected with improving weapons, tactics, professional services, and training of the armed forces gather there. Furthermore, international military organizations carrying out treaty obligations assemble and carry on their duties at that Post. In every sense of the word,

it is a military installation used primarily to aid the cause of National Defense, and it must be operated so as most effectively to utilize the time of those individuals who are required to spend their working hours at that station.

We, of course, do not entertain the view that the factors we have just mentioned cast light on the intent of · a Congress convened some 100 years ago. But they will come into focus when we have developed our reasons for concluding that the real purpose of the enactment was to prevent the use of enlisted men in assignments which contributed only to the convenience and personal benefit of individual officers and which had no reasonable connection with the efficient employment of the armed services as a fighting force.

The word "servant" has a myriad of meanings, but as used in the context of the original act, we con- ■ clude Congress intended to give it the meaning of one who labors or exerts himself for the personal benefit of an officer. Certainly it could not have intended to prevent an enlisted man from laboring for officers in the furtherance of their official duties. As enacted originally, the Act suggests that Congress was interested in having the enlisted men of the Army earn their pay in the performance of military duties, and not as personal servants attending to the physical comforts of their individual superior officers. The entire Section reads:

> "SEC. 14. *And be it further enacted,* That the pay and allowances of the enlisted men of the army shall remain as now fixed by law until the thirtieth of June, eighteen hundred and seventy-one; and it shall be unlawful for any officer to use any enlisted man as a servant in any case whatever."

A construction which would apply the proscription to the kind of work done, and not to its ultimate purpose, would so circumscribe the military community that the preparation for, or the waging of, war would be impossible. In some degree at least, most enlisted men

**352**

from the time they are inducted into the military service, spend some of their working hours performing tasks for commissioned officers, and in many cases the labors directly benefit the officer. Many of the tasks are equivalent to those performed by servants. A hospital corpsman may be ordered to administer to a sick or wounded officer. A cook in the combat zone or aboard ship may be directed to cook for the regimental commander or the ship's captain. A driver of a vehicle may be commanded to chauffeur his commander to a given destination. No one will dispute the legality of those commands, and yet the Army, particularly, has drawn a distinction between the duties of mess personnel in officers' messes and tasks much more menial than waiting on tables where officers alone are served. It is a refined distinction, because an enlisted man plainly cannot be made the servant of another enlisted man or a noncommissioned officer, but no question is raised as to the legality of work in messes which feed those ranks. There are some differences, but, with one possible exception, they are immaterial. No one would dispute the fact that certain social functions are held in an open officers' mess, but pretermitting that facet of the controversy for the moment, it is fully as expedient militarily that the officers be fed as that the enlisted men be messed. It also seems to follow that if it is a military necessity to guard the enlisted men's barracks, police their area, dispose of their garbage, police their latrine, and transport them from place to place, then it is equally necessary militarily to supply those same services to officers. As a matter of fact, as to the above-mentioned duties, no one seems to have questioned the legality of detailing enlisted men to perform those services for officers. Why then, is feeding an officer treated as being in a different category?

It is suggested that one reason lies in the organization of officers' open messes. AR 210–60, July ■ 20, 1951, defines an officers' open mess as a nonappropriated sundry association fund, estab-

lished by the installation commander and governed by a charter and by-laws. Its business is conducted by a board of governors elected from the membership and it is financed principally from fees and dues from its members, and income from its revenue-producing activities. In these and some other aspects, it is a voluntary association which is run by the members to suit their military and social purposes. If we were to stop there, some justification might exist to support the argument that enlisted men should not be used to supply the labor necessary for its operation. But the story is not complete. The officers' open mess is also an integral part of the Army establishment, an instrumentality of the Government and necessary to the interests of the armed forces. AR 210–60, section II, paragraph 6; AR 210–50, paragraphs 3*a*, 4*d*, and 4*d* (4). Its purpose is to provide services essential to the messing, billeting, morale and welfare of its members and all other officers who are temporarily on post. At many stations, it is the only feasible means by which casual officers can be fed. Officers attending service schools, those ordered to particular posts for temporary duty, those delayed en route, those on detached service, and those not permanently resident on the post would lose much of their working day if they were required to search out commercial eating places three times each day. When considered from that viewpoint, an officers' mess is an adjunct of the service, and it provides for the officers, so far as the eating facilities are concerned, the same service which a garrison or field ration mess provides for the enlisted man. Under present conditions, it is absolutely essential that officers be fed either in unit messes or in officers'· messes. The use of enlisted men to cook and perform other kitchen duties in enlisted messes has long been recognized as legal, and so long as the principal function of the officers' mess is to feed officers so there will be less interruption with their official duties, we can find no reason why Congress would intend to make the use of enlisted men in those messes illegal. When all is said and done, if an essential military purpose

is being served by the officers' mess, then we believe the employment of enlisted men is not a violation of the statute. We cannot state our view in better language than did the board of review in United States v. Semioli, supra. The board there said:

"... The test to be applied in a case where the question of disobedience of an illegal order is involved, is not whether the work which the accused was ordered to do in an officers' mess was menial in nature, such as KP, clerical work or janitor work, but rather whether these services were to be performed in the capacity of a private servant to accomplish a private purpose, or in the capacity of a soldier, i.e., to accomplish a necessary military purpose."

This brings us to the question of whether the Officers' Mess at Ft. McNair is necessary to the Army to carry out its military mission or whether it is a private club for the personal benefit of officers residing on the Post. From our previous recitation of the many military purposes for which the Post is used we have no hesitancy in concluding that messing officers at that Station is a military necessity. Whether that Officers' Open Mess goes beyond fulfilling that requirement we need not determine in this instance. An order is presumed to be legal, and if the accused contends he was ordered to perform some task which did not inure to the benefit of the Service but which was personal to a particular officer or group of officers, he failed to present evidence to that effect. The order was issued prior to the regular supper hour and it involved general duties to be performed in the kitchen of the mess. So far as this record discloses, his work, had it been performed, would have been for the benefit of the command as a whole and not for any particular individual.

IV

The second argument against the legality of the order is that the Army failed to comply with its own regulations governing the use of enlisted men in

officers' messes. The controlling regulation is SR 210–60–1, dated December 7, 1948. It permits the use of enlisted personnel on a full time basis in officers' messes within the limits of the continental United States if exceptional problems exist in obtaining adequate civilian help. But before this may be done, certain requirements must be met. The installation commander must first secure authorization from the major command, and only those personnel who volunteer may be used. Interviewing headquarters are directed to study thoroughly each request to make certain that it is in accordance with the announced policy. Final approval for the District of Columbia stations is delegated to the Commanding General, Military District of Washington.

The briefs and argument on behalf of the accused allege a complete absence of evidence that authority to act under the regulation was granted by the Commanding General of the Military District of Washington. But the record shows that such evidence was supplied by the testimony of Captain Hagood. He stated that the accused was assigned to the position at the Officers' Mess under a Table of Distribution issued from Headquarters, Military District of Washington, on April 30, 1954, and that the Table of Distribution was approved by the Commanding General of that command. The administrative determination required by the Special Regulation is implicit in the Table of Distribution, as we can assume that personnel would not be allocated to an organization unless it was determined that a necessity therefor existed and that the organizational allocation was legal. The testimony of Captain Hagood was nowhere called into question, and it clearly supplies the necessary evidence that proper authorization was granted in accordance with the governing Army directive.

V

We pass, then, to the second requirement under the regulation, which is also the second issue granted in this case. Because of the restriction imposed by the Army, if the accused was not a

354

volunteer, as contemplated by SR 210–60–1, supra, he could not lawfully be ordered to work on the day in question. This was a secondary factual issue at the trial and the law officer brought it into prominence by giving the following instruction:

"You are instructed that if you find the Commanding General, Military District of Washington approved the full-time use of enlisted personnel in the Officers' Open Mess at Fort Leslie McNair (pursuant to SR 210–60–1, paragraph 4), such approval applies only to enlisted personnel who volunteer to be assigned to this duty. A table of organization or a table of distribution which specifies the positions in the Officers' Open Mess to which enlisted men could be assigned would not be authority for assigning enlisted men to such duties unless they had first volunteered. If in this case you find that Pfc Robinson was assigned to a menial position in the Officers' Open Mess pursuant to such a table of organization or table of distribution and that he had not volunteered for such assignment, such assignment was illegal, any order given him to perform such work was illegal and it would be your duty to acquit the accused."

With that instruction in mind we must consider whether there is sufficient evidence in the record to support the court-martial's finding that the accused was a volunteer. In everyday usage the word "volunteer" connotes one who offers himself for any service of his own free will. There has to be some limitation in the scope of the definition in the military service, for the simple reason that a man inducted into the armed forces must perform some type of work. The best that can be said for the service volunteer, is that he has the free will to accept or reject the proposed assignment. If he is offered a fair choice within his qualifications, informed he has the option to refuse the assignment, told that he will not be ordered to do the particular duty if he objects, and he then elects to ac-

cept the assignment, he becomes a volunteer.

There is a dispute in the testimony as to this issue but the court-martial had the right to believe the witnesses for the prosecution or to believe the accused. Counsel for the accused understood the situation at the trial level, as he argued that it was a factual issue which should be resolved in his client's favor by the court-martial. Unfortunately for the accused, the triers of fact found for the Government, but to illuminate our reasons for holding the evidence sufficient to support the findings, we relate generally the evidence produced by both parties.

The witnesses for the Government testified that the accused was classified as a cook's helper because he had had experience in a unit mess. Difficulties arose between him and other members of the mess and he was recommended for reassignment. He was interviewed by the Classification Assignment Section at the Post, and the principal interview was with Captain Hagood, Military Personnel Officer at that Station. During the interview between the accused and the Captain, the former was oriented as to why he was present at the Personnel Section for reassignment. After a discussion of his problems, the Captain informed the accused that there was a vacancy for a man with his training in the Officers' Mess and that he would be considered for that assignment if he desired to accept it. He was informed that it was strictly up to him, and if he wanted the position, he would be assigned there. However, if he did not want to continue in the field of cooking, he would be considered for another assignment on or off the Post. According to the Captain, the accused replied that he was desirous of having the particular assignment at the Officers' Mess. It was explained to him that because of his grade he would be assigned as a cook's helper; that if he desired the position he would be referred to the Club Officer; and that if that officer was satisfied with his qualifications and experience, he would be accepted. On cross-examination, upon being pressed for the exact words used by the accused in reply to the explanation, the Captain stated the accused replied "I would be very happy to take the assignment." The Captain expressed familiarity with the regulation which prohibited the use of enlisted men in officers' messes unless they volunteered and he stated that his Section operated strictly in accordance with that requirement.

The accused does not dispute the testimony given by Captain Hagood but he did testify that he did not volunteer to serve in the Officers' Open Mess and that he did not think he could reject that assignment. Further, he testified that he offered no objection to anyone concerning the placement; that he expected to be employed as a cook; that he was so used for two and one-third days but his work was not up to the standards of the Mess; that he was then given kitchen police duties; and that his refusal to work was based on his physical condition.

Some suggestion is advanced that the accused was directed to perform duties outside the scope of the position for which he volunteered. The record of trial and Army Regulations dispose effectively of that contention. The accused was a private first class, he was rated as a cook's helper, he was aware of his classification, he was assigned as a cook's helper, and there is not an iota of evidence that he was ordered to perform any task not fairly within the range of his regular duties. The tasks to be performed by an enlisted man with his qualifications are defined in SR 615–25–15, November 15, 1950 (in effect on the date of the offense), as follows:

"MOS Code 3060
COOK

Grades E–2, E–3, E–4, and E–5

"*Summary*: Prepares and serves food according to standard army recipes, and cleans and maintains mess equipment in a consolidated or unit mess.

"*Duties*: . . . As cook's helper assists cook in preparing and serving

**355**

food. Washes, peels, cuts, and dices fruits and vegetables. Slices meat. Stores rations. Procures ingredients for cook. Assists mess steward in repairing dining room. Portions and serves food in serving line. Cleans kitchen and mess hall tools and equipment."

Undoubtedly the following questions and answers illustrate aptly the bone of contention in this case. This is an examination by a court member:

"Q. I want to make sure I understand. Your objection to working in the Officers' Mess was what? What was your specific objection?

A. I didn't tell anyone of my objections. I didn't make it known to the officer that assigned me or I didn't make it known to Captain Wilson, but the first day I got there I did want to cook, and I guess he saw I was objecting to pulling K. P. there. That was the only objection.

"Q. Do you have objection to K.P.?

A. Yes, sir, I have.

"Q. I am sure you have heard certain regulations being read here in court. You are familiar with those now, Army regulations, special regulations?

A. Some of them I am, sir.

"Q. From what you know, did you object to going there because you did not volunteer in accordance with those regulations?

A. I don't quite get what you mean?

"Q. According to the regulations, as I understand them, you have to volunteer to work in an Officers' Mess.

A. Yes.

"Q. Did you object to working in the Officers' Mess because you did not volunteer?

A. I couldn't answer that question direct, but I objected because I didn't want to pull K. P., but I accepted because I wanted to cook.

"Q. Had you known that you had to volunteer in order to work in the Officers' Mess, would you have volunteered to work there as a cook?

A. No, sir, I wouldn't work there."

When deciding whether the accused was a volunteer, the court-martial could have reasonably found, from all of the evidence, that he exercised his own free will in accepting the assignment to the Officers' Mess; that he was pleased to volunteer for the position as a cook's helper; that the duties of a cook's helper include the type of work accused was required to perform; that he would have been content to continue in the assignment had he been able to cook instead of wash dishes; that he became dissatisfied with his detail when he was required to perform the more menial tasks required of a cook's helper; and that he then revolted. While he contends he did not know he could refuse the assignment, his testimony is contradicted flatly by Captain Hagood who testified he told the accused he would not be assigned unless he desired the assignment, and the decision was entirely up to him.

It is argued that if the accused was a volunteer he was at liberty to quit at any time. Obviously that argument overlooks the legality of the employment. If he volunteered in the first instance and a volunteer can be assigned legally to an officers' mess, then both the employment and the order were legal. We have concluded that the Special Regulation is not contrary to the Statute, and the court-martial found the accused was a volunteer. Therefore, until such time as he took appropriate action to be relieved of his detail, he could be required to perform the duties of his assigned job. Otherwise, a person has more than an option to accept an assignment, he has a choice of obeying or disobeying any work order given to him after his assignment has been effectuated.

We believe the appropriate issue was submitted to the court-martial under proper instructions, and that there is ample evidence to sustain the findings. The decision of the board of review should be affirmed.

It is so ordered.

Chief Judge QUINN concurs.

BROSMAN, Judge (dissenting):

I am afraid that I cannot agree that

·the decision of the board of review in this case should be affirmed.

## II

At the outset I must make several concessions *arguendo* for the present purpose. In the first place, I grant on this basis the validity of the Regulations, the effect of which is to proscriLe the assignment of military personnel to duty in officers' clubs, save on a strictly voluntary basis. And I accept similarly the notion that the Military District of Washington had authorized such assignments here, following a finding of the "necessity" contemplated by the Regulations.[1] Therefore, I agree that, if the accused, Robinson, *volunteered*, within the requirement of the Regulations, for service in the McNair officers' club as a laborer—the position he occupied under the club's table of distribution at the time in suit, according to the testimony of the club's administrative officer—then his assignment there was both legal and unterminated, and the lawfulness of the order he violated is assured. But I do not believe that he volunteered.

It strikes me that the term "volunteer" must be taken to have been used in the Regulations with which we are concerned in a special and relatively narrow sense. Frequently, and for the soundest of reasons, military officers issue requests for "volunteers" for the performance of a wide variety of duties, assignments and missions—and as often secure them. In the cases of which I speak, however, the tasks concerned might lawfully have been assigned, without regard to election, in the absence of bidders—and undeniably would have been.

Here—and accepting fully the intendment of the testimony of Captain Hagood, the post personnel officer—the accused was "offered" an assignment as a cook's helper at the McNair club. At the same time, it appears to have been made clear to him—although I make no suggestion of menace—that the cost of rejection was transfer to another and undisclosed military station. He doubtless made an election, for he must have understood—certainly he had been told —that another choice was open to him. He was, I am sure, a "volunteer" of sorts. But was he one of the variety contemplated by the Regulations? I think not—for the principal reason that he was wholly uninformed that the assignment he "accepted" could not possibly have been made without his consent, and that its only legal basis lay in his affirmative wish to serve at the club.

## III

In addition—and conceding an exercise of informed choice—I doubt that Robinson volunteered as a *laborer*. As I understand Captain Hagood's testimony, he was "offered" duty as a *cook's helper*. And thus we are met by the question: With respect to what duty must a soldier volunteer under these Regulations? Does one solicit officers' club service in blank—and is that enough? Or must the applicant offer for a single and specific position under the organization's table of distribution? The latter is not an essential requirement, I should think, and the truth must lie somewhere in between.

Hence, we must inquire in such cases whether there exists a sufficient similarity between the assignment sought, and that in fact made, to enable us to conclude that the soldier was given the duty for which he volunteered. We are required to take a reasonable position here, I am sure, but we cannot overlook the fact that—since the Regulations are in derogation of statutory law, as inter-

[1] In urging that his client be found not guilty, assigned military defense counsel at the trial argued with much force that, in view of Fort McNair's location in the very heart of the highly populous District of Columbia, it is little short of inconceivable—by reason of facts of which the court-martial could take judicial notice—that any sort of "necessity" exists in fact for the assignment of enlisted personnel to full time service in the McNair club. He suggested, indeed, that the only "necessity" for the failure to utilize readily available civilian personnel in the facility lay in the possibility that its members might be required to pay somewhat higher dues.

preted by Federal courts and high administrative officials—they may not be construed loosely. I would suppose, for example, that one who had volunteered, say, as a meat chef might properly be transferred to duty as second cook. On the other hand, I doubt that it would be lawful to assign a soldier to a permanent latrine detail following his request for duty as a principal enlisted assistant to a club's administrative officer.

Now what of Robinson's situation? In accordance with the table of distribution, he was serving as a *laborer*—a term revealed by the testimony of the club officer, Captain Wilson, to have constituted a euphemism for membership in a kitchen police detail. I am willing to grant that, while acting in such a capacity, he may in some sense have "helped" the facility's cooks. However, it is not my understanding that kitchen police duties are among those customarily assigned to a *cook's helper* —which appears to have been the accused's military specialty.[2] Certainly one with enlisted experience—or any slightest contact with food service duties—will readily acknowledge that a gulf of almost limitless proportions separates the performance of cooking and kitchen police functions. In light of that vast difference, I cannot see how I can accept the conclusion that, in volunteering to cook in the officers' club, Robinson agreed to assume what appears to have been a permanent assignment to the menial chores he was ultimately called on to perform.

IV

Although the language of the Regulations at the core of this case demands the conclusion that an officers' club assignment is terminable at the will of the soldier, I do not at all mean to imply that an orderly procedure of departure is not to be required. Certainly, a military person is not permitted, informally and without more, to take himself off, once his period of enlistment has elapsed. Indeed, he will find himself guilty of absence without leave if he does. So here one may not, I think, end sought service at an officers' club by a casual exercise of unilateral will—and this is true despite the fact that the assignment's legality must depend on the continuing volition of the assignee.

Although the record contains testimony which distinctly suggests that Robinson had, in fact, requested reassignment from the McNair club in advance of his disobedience, it is unnecessary that I rely on this sort of approach in the development of my views. Instead, I need only ask this: How could Robinson reasonably have been expected

---

[2] While a cook's helper (food service helper) may, on occasion, reasonably be expected to perform duties connected with the cleaning of certain kitchen equipment and the like, clearly it is not the intendment of Army Regulations that he be relegated to full time kitchen police duties. "Food service helper" constitutes a recognized military occupational specialty—MOS Code 940 at the present time—and demands special skills and knowledge, which requirements are set out in Regulations and elsewhere. See SR 615–25–15, November 1950, page 211; AR 611–201, March 1955, page 921.

On the other hand, kitchen police (laborer) duties are distinctly menial in character, and demand no sort of special aptitude or training. Almost every soldier, regardless of military specialty or assignment or prior training, has been called on necessarily to perform KP labor. Moreover, while it is legally impermissible to utilize kitchen police service as punishment, most military personnel would deem the full time and indefinite assignment to its performance as agonizing a duty as may be found in the entire gamut of military chores. Yet Robinson is considered by the majority to have "volunteered" for exactly this career of usefulness.

The point of the business is that, while it is one thing to be called on appropriately—as a cook's helper—to accomplish an occasional task normally falling within the ambit of kitchen police (laborer) service, it is quite another to be transferred to that unpleasant duty permanently. Examining the applicable military directives, together with service custom and the realities of the situation—of all of which this Court may take judicial notice—I simply cannot conclude that the accused before us freely elected to perform the duty he denied.

to know that he enjoyed a privilege to terminate the assignment at will—albeit in an orderly manner—in the absence of an explanation of his status at the time he undertook the duty? And it is abundantly clear from Captain Hagood's testimony that he did not receive one. All he could possibly have understood from Hagood's language was that he might choose between an assignment to the club and a transfer from Fort McNair—an option not infrequently granted military personnel under circumstances in which either alternative might lawfully be compelled. Certainly he was not informed of anything which remotely suggested that the only legal basis for the club assignment lay in an exercise of his own will.

Under this analysis it may be argued, of course, that the accused's disobedience was the more culpable by reason of his conception of his assignment as one in no way dependent on his wishes. Perhaps this is true, but I need not consider the matter—because it has nothing whatever to do with the legality of the assignment, and hence of the disobeyed order. We are not concerned here with the relative blackness of the accused's heart, but rather with the narrow—and perhaps technical—question of whether the order disobeyed by him was a *legal* one, as it must have been if the conviction is to be upheld. In my view it was not—this for the reason that the assignment was unlawful, and this in turn because the accused did not volunteer within the meaning of relevant Regulations.

V

I would reverse the decision of the board of review.