UNITED STATES, Appellee

v

THOMAS W. CATLOW, Private, U. S. Army, Appellant

No. 27,599

June 21, 1974

*George Clyde Gray, Esquire,* argued the cause for Appellant, Accused. With him on the brief were *Rowland Watts, Esquire, Stephen I. Hurwitz, Esquire, Michael Lerner, Esquire, Lieutenant Colonel Edward S. Adamkewicz, Jr., Captain Richard T. Simmons, Jr.,* and *Captain Gilbert J. Weller.*

*Captain Joel M. Martel* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Ronald M. Holdaway, Lieutenant Colonel Donald W. Hansen,* and *Captain Robert C. Roth, Jr.*

## OPINION OF THE COURT

QUINN, Judge:

Primarily, this appeal challenges the accused's status as a person subject to court-martial; secondarily, it disputes the qualification of the convening authority to review the conviction.

In December 1971, the accused was arraigned on a charge of unauthorized

absence from December 30, 1969, to October 4, 1971. Among other motions, defense counsel moved to dismiss the charge on the ground the accused was not subject to military jurisdiction. Although defense counsel requested an evidentiary hearing to develop the details of the broad outlines of an offer of proof in support of the motion, trial counsel argued there was "no necessity . . . to call any of these witnesses or subpoena any of the documents." The judge agreed. Accepting the facts presented by the defense, the judge ruled that the accused had entered into a "valid enlistment" and was subject to trial by court-martial. Trial continued to conviction and sentence. On review, the Court of Military Review upheld the trial ruling with the observation that "even if the facts most favorable to . . . [accused's] position are accepted" he "had no legal basis for objecting" to the jurisdiction of the court. United States v Catlow, 47 CMR 617, 620 (ACMR 1973). In this Court, government counsel also contend that "even if all of appellant's exaggerated factual allegations were accepted as true," his enlistment was voluntary. Consequently, we approach the jurisdictional issue from the standpoint that the facts must be construed in the light most favorable to the accused. Cf United States v Garcia, 5 USCMA 88, 17 CMR 88 (1954).

The accused was born on November 14, 1951. By the time he was 16 years of age, his parents had been divorced and his mother had remarried. After being "shifted" between father and mother for a time, the accused remained in the custody of his mother. She was bringing up 14 children, six of whom were the children of her second husband. Eventually, and perhaps partly because of differences between the accused and his stepfather, it was determined that the accused "couldn't live at home anymore." At the "direction" of a court, the accused's mother "signed" documents which resulted in designation of his uncle, Joseph Cree, as his "legal guardian." The accused took up residence with his uncle in Freehold, New Jersey. A fight with the father of a neighbor's child, which came about when the accused went to the assistance of his cousin, led to various charges. While these were not prosecuted to judgment, the accused's aunt concluded she "couldn't handle" the accused, so his father "came and took" him. Later, he quarreled with his father, and he went to live with his mother.

About a month before his 17th birthday, the accused was arrested. At a court hearing, his father appeared in his behalf, but was advised that he "could not do anything" for the accused because he was "not the guardian." A few days later the accused appeared before a judge of the Monmouth County Juvenile Court on charges which authorized indeterminate detention for 5 years, apparently the time the accused would attain his majority. The judge informed the accused there was "no one who would take" him, and his "only choice" was between "five years indefinite in jail" or to enlist for 3 years in the Army. The accused did not "feel" the choice was justifiable and he did not "want" to go into the Army, but as "a way out" of his dilemma, he chose the Army. About a week later an Army recruiter obtained the accused's release from jail to enable him to "fill out the papers and take the test" in the recruiting office in Red Bank, New Jersey, and for a trip to Union Beach, New Jersey, for his mother to sign the papers which "the Army required." On the accused's birthday, November 14, the Army recruiter "signed him out" from jail and took him for a physical examination. As the jail authorities did not want the accused back, the recruiter allowed him to remain at liberty until November 20, when he was formally inducted into the Army. On November 28, the charges against the accused at the Monmouth Juvenile Court were dismissed, with a docket notation that the accused was in the Army.

Joseph Cree, the accused's legal guardian was "not aware" of the accused's enlistment. However, he apparently learned of it some time in January 1969. By that time the accused was in trouble in the Army. As he had not really "want[ed] to come into the Army," he hoped that if he misbehaved he would be "thrown out." Among his efforts to achieve that result, he went absent with-

out authority and refused to obey orders. This "accumulated" record of misdeeds was perceived by trial counsel as demonstrating that "since entering upon active duty in the United States Army," the accused "never serve[d] in the United States Army honorably."

Apparently the accused's initial efforts to get out of the Army did not extend to requesting Mr. Cree to apply for his release on the ground that accused's enlistment was effected without his consent as legal guardian. See United States v Graham, 22 USCMA 75, 46 CMR 75 (1972). By April 9, however, that course may have become a feasible alternative, but the offer of proof indicates that the accused "was unable to get any assistance from any source [in the Army] in order to make application to secure his release." Implied in the offer and in other evidence is that the accused's uncle then stood ready to protest the accused's enlistment and secure his release.

The major aspect of accused's challenge of military jurisdiction over him is predicated upon the fact that under Army regulations a person circumstanced as he was could not lawfully be enlisted. Army regulations enumerated various conditions that disqualified an applicant for enlistment; they prohibited requests for waiver of these conditions and directed that any such request would "not [be] considered." AR 601-210, paragraph 2-6, May 1, 1968. One of the listed conditions of ineligibility was that criminal or juvenile charges by civil authorities were pending against the applicant. This prohibition expressly included persons who "as an alternative to . . . incarceration in connection with the charges, or to further proceedings relating to adjudication as a youthful offender or juvenile delinquent, are granted a release from the charges at any stage of the court proceedings on the condition that they will apply for or be accepted for enlistment in the Regular Army." *Id* at 2-12 n 2

Relying on United States v Grimley, 137 US 147 (1890), government counsel contend that the disqualification is intended for the benefit of the Army and can be invoked only by it. Whatever the merit of the Government's argument as to such other conditions of ineligibility enumerated in the regulation as the applicant has a child born out of wedlock or has a history of venereal disease, the condition affecting the accused is not so one-sided. In *Grimley,* the Supreme Court dealt with a provision limiting enlistment to persons between the ages of 16 and 35. Grimley was 40 years of age, but he was enlisted on his representation that he was 28. Later, when convicted of desertion, he sought a writ of habeas corpus from a United States District Court to obtain his release from military custody on the ground that his enlistment was void because he was disqualified by the statutory provision as to age. Rejecting Grimley's contention, the Supreme Court said in pertinent part:

> It must be noted here, that in the present contract is involved no matter of duress, imposition, ignorance, or intoxication. Grimley was sober, and of his own volition went to the recruiting officer and enlisted. There was no compulsion, no solicitation, no misrepresentation. A man of mature years, he entered freely into the contract. . . . Enlistment is a contract; but it is one of those contracts which changes the *status;* and where that is changed, no breach of the contract destroys the new *status* or relieves from the obligations which its existence imposes. . . . [I]t is a general rule accompanying a change of *status,* that when once accomplished it is not destroyed by the mere misconduct of one of the parties, and the guilty party cannot plead his own wrong as working a termination and destruction thereof. Especially is he debarred from pleading the existence of facts personal to himself, existing before the change of *status,* the entrance into new relations, which would have excused him from entering into those relations and making the change, or, if disclosed to the other party, would have led it to decline admission into the relation, or consent to the change.
>
> Of course these considerations may not apply where there is insanity, idiocy, infancy, or any other disability which, in its nature, disables a party from changing his *status* or entering

into new relations. But where a party is *sui juris,* without any disability to enter into the new relations, the rule generally applies as stated. . . . So, unless there be in the nature of things some inherent vice in the existence of the relation, or natural wrong in the manner in which it was established, public policy requires that it should not be disturbed. Now, there is no inherent vice in the military service of a man forty years of age. The age of thirty-five, as prescribed in the Statute, is one of convenience merely. The government has the right to the military service of all its able-bodied citizens, and may, when emergency arises, justly exact that service from all. And if, for its own convenience, and with a view to the selection of the best material, it has fixed the age at thirty-five, it is a matter which in any given case it may waive; and it does not lie in the mouth of any one above that age, on that account alone, to demand release from an obligation voluntarily assumed, and discharge from a service voluntarily entered into. The government, and the government alone, is the party to the transaction that can raise objections on that ground.

137 US at 151-54.

■ The ground of accused's ineligibility is not exclusively for the Army's benefit. A letter by the Judge Advocate General of the Army to Chief Justices of various courts, set out as an Appendix to this opinion, leaves no doubt that the exclusionary condition was intended also to benefit the individual. As the letter indicates the "circumstances" of entry into the Army are such that the individual faces "a high potential for difficulties in service" and risks grave impairment of his chances for rehabilitation. Understandably, the Judge Advocate General perceived the person who chooses enlistment in the Army as an alternative to confinement in a civilian jail as a "forced volunteer." Implicit in the Judge Advocate General's judgment are findings of fact predicated upon empirical experience with such "forced" volunteers. Perhaps his findings are not entitled to the same weight as findings of fact made directly by a ruling-making

authority, see Perez v United States, 402 US 146 (1971), but his reasoned judgment is entitled to consideration. United States v Robinson, 6 USCMA 347, 20 CMR 63 (1955).

■ Undeniably, the accused signed the required papers for enlistment and underwent the required physical examination, but the performance of these acts does not mean that he acted voluntarily. As Mr. Justice Stewart noted in his opinion for the Supreme Court in Schneckloth v Bustamonte, 412 US 218, 224-25 (1973), even statements obtained by brutal treatment are voluntary in "'the sense of representing a choice of alternatives'" but they are not voluntary in the sense of being "the product of an essentially free and unconstrained choice" by their maker. A court cannot use its sentencing power "as a carrot and stick" to compel a defendant to choose between alternatives presented by it that force him to surrender a right that he has. United States v Stockwell, 472 F2d 1186, 1187 (9th Cir 1973), *cert denied,* 411 US 948 (1973). Such action constitutes "an insurmountable element of coercion." United States v Anderson, 468 F2d 440, 443 (5th Cir 1972). Unlike *Grimley,* therefore, this accused did not of his "own volition . . . [go] to the recruiting officer and" enlist; and, there was in the situation confronting him, unlike that facing Grimley, an "inherent vice" that affected his acquisition of the status of a member of the Army. Paraphrasing United States v Robinson, supra at 351, 20 CMR at 67, "we do not believe that [the accused] volunteer[ed] to violate . . . [the law] and thereby cloak the proscribed act with legality." We conclude that the accused's enlistment was void at its inception.

Government counsel contend that if the accused's initial enlistment was void, he was still subject to trial for the charges of which he stands convicted because a constructive enlistment resulted from his later acceptance of pay and allowances. Although the nature of the disqualification to enlist suggests that it is continuously disabling, the Court of Military Review held that "dismissal of the civilian charges on 28 November 1968" eliminated the condition of ineligibility. United States v Catlow,

47 CMR at 619. We assume for purposes of this appeal that after the charges were dismissed the accused could effectuate a constructive enlistment. As the accused was over 17 years of age, his capability to effect a constructive enlistment may not have depended on whether he had the consent of the person whose consent was required by law, but the Government was required to prove that after removal of the condition of ineligibility, "the accused changed his status." United States v Overton, 9 USCMA 684, 688, 26 CMR 464, 468 (1958).

■ An accused's acknowledged receipt of pay and other emoluments of service, such as medical attention and mess privileges, after dismissal of the civilian charges may support an inference that he intended to be a member of the military service once he was qualified. United States v Graham, 22 USCMA at 76, 46 CMR at 76. The inference, however, does "not negate" this accused's forced entry into the Army and his subsequent active and varied "protestations against continued service." Id at 77, 46 CMR at 77. In short, the facts conceded by the Government to be true did not satisfy the Government's burden of proving that, after the assumed termination of the condition of ineligibility, the accused so conducted himself as to accomplish a constructive enlistment. United States v Overton, supra.

The decision of the Court of Military Review is reversed. The findings of guilty and sentence are set aside, and the charge is ordered dismissed.

Chief Judge DUNCAN and Senior Judge FERGUSON concur.

## APPENDIX

### DEPARTMENT OF THE ARMY
Office of the Judge Advocate General
Washington, D. C. 20310

. . . . .

Dear Mr. Chief Justice:

This letter is sent in the hope that you may assist us in the active Army of the United States to overcome a difficulty that is quite serious for us. It arises out of the well-intentioned but service-damaging practices of some judiciary and law enforcement officials who urge an offender to enlist in the Army in lieu of trial or punishment by the civilian authorities.

The individual who enlists or volunteers for induction under such conditions does not truly desire to be a professional soldier. He is not motivated to improve his skills and become an effective member of a fighting team. Whether dissatisfied with the Army as a whole or with some lesser portion of it, such as his duties, assignment, or the personnel with whom he must work, he often becomes discontented. Such discontent often leads to serious conflict with military authority. In many cases, this conflict with military authority must be resolved administratively or through the Uniform Code of Military Justice. If a discharge results, it is frequently under less than honorable conditions. Moreover, the discharge of a member prior to the expiration of his term of service results in the waste of taxpayers' money which has been expended to train the member.

In addition to training costs, the costs of processing either an administrative or judicial proceeding must be added. Any practice which results in the expenditure of funds for members who will not serve satisfactorily is fundamentally wrong.

I recognize that the judicial officer who provides the offender with the alternative of "jail or the Army" does so with an altruistic motive, hoping that the Army will rehabilitate the individual.

Because of the circumstances of his entry, however, such a "forced volunteer" has a high potential for difficulties in service. Rather than being rehabilitated, he may leave the service with a discharge under other than honorable conditions. What was intended to be an aid to the youthful offender thus quite often becomes another drawback to his becoming a useful and law-abiding member of the community.

The elimination of the "forced volunteer" practice will assist the Army greatly in its effort to become a more efficient force of professionally motivated volunteers. It is believed that if those persons who utilize the "forced volunteer" practice were informed of the dis-

service that it does to the taxpayer, the Army, and to the individual, this practice could be eliminated.

Any assistance which you or your office may give toward elimination of this practice would be sincerely appreciated.

Sincerely,

GEORGE S. PRUGH
Major General, USA
The Judge Advocate General