UNITED STATES, Appellee

v

BERNEL J. BAYHAND, Private First Class, U. S. Army, Appellant

6 USCMA 762, 21 CMR 84

No. 7535

Decided March 30, 1956

*First Lieutenant Robert J. Hearon, Jr.* argued the cause for Appellant, Accused. With him on the brief was *Captain Frank C. Stetson.*

*First Lieutenant Edward S. Nelson* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Thomas J. Newton* and *First Lieutenant Russell L. Brenneman, Jr.*

## Opinion of the Court

GEORGE W. LATIMER, Judge:

The accused was found guilty by general court-martial of willful disobedience of a superior officer and willful disobedience of a noncommissioned officer, in violation of Articles 90 and 91 of the Uniform Code of Military Justice, 50 USC §§ 684 and 685, respectively. He was sentenced to be dishonorably discharged from the service, to forfeit all pay and allowances and to be confined at hard labor for five and one-half years. The convening authority approved the findings and sentence, but reduced the period of confinement to three years. A board of review in the office of The Judge Advocate General of the Army affirmed the conviction, and so much of the sentence as provided for a dishonorable discharge, total forfeitures and confinement for two years. We granted review to determine whether the orders which were disobeyed were legal.

The facts of the case are not complicated. At the time each alleged offense was committed, the accused was in confinement in the Post Stockade, awaiting trial on charges which were subsequently dismissed. The first instance of disobedience arose on April 20, 1955, while he was serving on a work detail under guard, in company with a prisoner who, we can safely assume, had been sentenced to confinement at hard labor by a prior special court-martial. We may make that as-

764

sumption because of an exhibit—a certified copy of a special court-martial order sentencing the fellow worker to confinement—which the law officer erroneously refused to admit in evidence, but whose contents were not disputed at the trial and are not contested on appeal. The Government has at least tacitly admitted that the exhibit is before us, and if we do not make this assumption, it would be necessary to broaden the issues before us, and, after additional argument, determine the effect of the law officer's ruling. The accused was furnished with a regular fatigue uniform with a white band around the arm, and the sentenced prisoner working with him was identically clothed. Both men were required to work with picks and shovels; they were being used to change the course of an old ditch; the nature of the work required them to stand in mud and water which reached half way up on their boots; and, for all purposes, the two were performing equivalent duties. There were other prisoners, at least one of whom was a sentenced prisoner, engaged in the same task. After they had been busy for about forty-five minutes, each notified the guard that he refused to work and demanded to be taken to the gate. They were then brought before the confinement officer who gave them an order to return to their task. The accused replied that he refused to work, and his refusal furnished the basis for the offense alleged in the first Charge.

The second alleged offense grew out of the following facts: On May 9, 1955, the accused was assigned to duty with a regular work detail in the rock quarry. There were at least twelve prisoners on the detail, and the work was such that it reasonably could be considered as hard labor. The noncommissioned officer in charge ordered the accused to carry heavy rocks to a rockpile and to assist in the loading of a wheelbarrow. Although he complied with the latter part of the order, the accused refused to carry rocks, stating that he would not perform both tasks.

As part of the evidence touching on both offenses, the confinement officer testified that the accused, at the time of the alleged violations, was an unsentenced prisoner. In addition, he stated that, under the procedure followed in the guardhouse, there was no difference in the type of duty performed by sentenced and unsentenced prisoners.

The accused took the stand for the purpose of disputing the Government's version of the second episode. Testifying in his own behalf with respect to that alleged violation, he asserted that he had complied with the sergeant's order in all respects. He also contended that on the date of the incident, he was suffering from a pain in his side, and that six days later an operation was performed on him for appendicitis. However, he had not informed the sergeant of that fact at the time the order to carry rocks was given.

II

In order to ascertain the legality or illegality of the orders, it is necessary that we consider both the present law and its historical development. Article 13 of the Uniform Code, 50 USC § 567, provides:

"Subject to the provisions of article 57, no person, while being held for trial or the results of trial, shall be subjected to punishment or penalty other than arrest or confinement upon the charges pending against him, nor shall the arrest or confinement imposed upon him be any more rigorous than the circumstances require to insure his presence, but he may be subject to minor punishment during such period for infractions of discipline."

To bring into prominence the principles which we believe brought about that enactment, we begin with the Articles of War in effect in 1775. Article XLI provided:

"To the end that offenders may be brought to justice; whenever any officer or soldier shall commit a crime deserving punishment, he shall, by his commanding officer, if an officer, be put in arrest; if a non-commissioned officer or soldier, be imprisoned till he shall be either tried by

a court-martial, or shall be lawfully discharged by proper authority."

There was no substantial change in that provision until 1920, when Article 69 of the Articles of War of that date, 41 Stat 802, was enacted. It was in effect from that time until 1948, and it placed Congress on record as favoring a more intelligent and humane treatment of persons whose guilt had not been determined. It provided that:

"Any person subject to military law charged with crime or with a serious offense under these articles shall be placed in confinement or in arrest, as circumstances may require."

It will thus be observed that the absolute confinement of earlier day was relaxed and the only valid reason for incarceration prior to conviction, i.e., to assure appearance for trial, started to influence the makers of the law.

Paragraph 19 of the 1949 Manual for Courts-Martial, U. S. Army, took another step toward relaxing restraints, for it states that:

". . . The character and duration of the restraint imposed before and during trial, and pending final action upon the case, will be the minimum necessary under the circumstances."

The present Manual for Courts-Martial, United States, 1951, is the latest expression by the Executive on this subject, and there we find the following statement:

". . . Confinement will not be imposed pending trial unless deemed necessary to insure the presence of the accused at the trial or because of the seriousness of the offense charged." [Paragraph 20c.]

As we view the changes, the earlier Articles of War and Manual provisions failed to take cognizance of the fact that confinement itself was a form of penal servitude, and that if the restraint imposed was more than that needed to retain safe custody, the unnecessary restrictions were in the nature of punishment. Present-day enactments in this field seem to show

a Congressional and Executive recognition of that principle, and an intent to change the old order by softening the injustice which is inherent in a system not permitting freedom on bail. If, therefore, Congress directed some preferment for an unsentenced person in one area, it could be expected to do the same in other areas if they, too, created unnecessary injustices.

Obviously, the area of importance in this instance is that which has to do with another method of punishing unsentenced prisoners who are in confinement. Congress effectively legislated in that field by enacting laws to prohibit all forms of punishment until after conviction. Apparently the lawmakers became dissatisfied with the treatment of confined servicemen who had not been tried, for by specific statutory language they prohibited the imposition of punishment upon such individuals. Article of War 16 was amended in 1948 (62 Stat 630) so as to include the following provision:

"No person subject to military law shall be confined with enemy prisoners or any other foreign nationals outside of the continental limits of the United States, nor shall any defendant awaiting trial be made subject to punishment or penalties other than confinement prior to sentence on charges against him."

The Manual for Courts-Martial, U. S. Army, 1949, repeated that mandate, and, in addition, provided that prisoners whose sentences had not been executed should be distinguished from prisoners serving sentences, in that they would be accorded the facilities, accommodations, treatment, and training prescribed for unsentenced prisoners in accordance with Army regulations. Manual for Courts-Martial, supra, paragraph 19. While authorities in military law, later referred to in this opinion, inform us that discrimination between sentenced and unsentenced prisoners has long been recognized, it would appear from our previous development that by 1948, at the latest, laws had been enacted which required a difference in treatment between the classes of prisoners and that Congress, in

carving out distinct categories, made it crystal clear that prison and stockade officials must respect the rights of the unsentenced class.

When the House Armed Services Subcommittee of the 81st Congress met to consider Article 13, supra, of the Uniform Code of Military Justice, it was made aware of the difference in treatment prescribed for unsentenced and sentenced prisoners. In fact, the commentary to the recommended draft of Article 13 stated that the Article was directly derived from Article of War 16, supra. And there can be no doubt that Congress fully intended to distinguish in favor of persons awaiting trial, for, in explanation of the wording of the Code, the following colloquy among members of the House Armed Services Subcommittee occurred:

"MR. SMART: . . . I might advise the committee that that likewise was a floor amendment during the consideration of 2575 and it was raised for the reason that apparently people who were confined pending trial were being subjected to rock breaking and everything else, the same as people who had already been convicted of offenses and happened to be incarcerated in the same place of confinement.

That is the reason for it. And this is merely a carry over from 2575.

. . . . .

MR. BROOKS. Is there any discussion on article 13?

MR. RIVERS. Well the case you have in mind is if you have a boy incarcerated for an alleged offense, unless he is just insubordinate in the jail there, there is the only time you can impose any disciplinary action?

MR. SMART. Exactly right.

MR. RIVERS. And in no case can you impose possible rock breaking on him.

MR. SMART. That is right.

MR. RIVERS. That is the case you have in mind.

MR. GAVIN. Yes.

MR. SMART. That is the intent of this article.

MR. GAVIN. In no case can rock breaking be imposed upon him, unless convicted.

MR. SMART. Correct.

MR. GAVIN. And sentenced for it.

MR. SMART. Correct.

MR. RIVERS. Sentenced for it as a result of conviction, I should say.

MR. LARKIN. Hard labor, that is right." [Hearings before a subcommittee of the Committee on Armed Services, House of Representatives, on H. R. 2498, 81st Congress, 1st Session, pages 916–917.]

Not only did Congress consider the question of the preferential treatment to be given prisoners awaiting trial, but, in amplification of Article 13 of the Code, supra, the drafters of the Manual for Courts-Martial, United States, 1951, wrote, and the President promulgated, the following provision:

". . . During such periods prior to the order directing execution of the sentence, an accused of those classes [accused being held awaiting trial or in confinement awaiting action by the officer authorized to order the sentence executed] will not be required to observe either duty hours or training schedules devised as punitive measures, nor required to perform punitive labor, nor required to wear other than the uniform prescribed for unsentenced prisoners, except that he may be subjected to minor punishment for infractions of discipline (see Art. 13)." [Paragraph 125.]

Current Army regulations contain very little language supplementing that paragraph of the Manual, but they do state that the confinement of persons subject to military law will be in accordance with the Manual for Courts-Martial, and that sentenced and unsentenced prisoners shall wear brassards bearing different types of distinctive markings. See SR 210–188–1, dated September 16, 1952. The unsentenced prisoner is supposed to wear a white arm band, whereas the prisoner serving a sentence displays an arm band upon which is blocked the letter "S." See SR 600–60–1, April 8, 1953. At the very least, then, the Department of the Army reaffirmed the Manual

requirement, and announced a policy which requires confinement officials to provide visible means of distinguishing the unsentenced from the sentenced prisoners.

From the foregoing, the conclusion is inescapable that Congress, the framers of the Manuals for Courts-Martial, and the Army must have recognized that gross injustices might result from any confinement system in which one accused of crime was treated no better than one proved guilty. Therefore, to eliminate any and all forms of punishment prior to trial, except that which is inherent in all confinement, laws and regulations were enacted to protect the untried confinee. It must be remembered that the only valid ground for ordering confinement prior to trial is to insure the continued presence of the accused, as where he has earlier indicated that his obligation to remain with his unit weighs lightly with him, or where the seriousness of the offense alleged is likely to tempt him to take leave of his surroundings.

### III

If the problem in this case was no more than an interpretation of the law to determine whether Congress intended to prefer the accused who had not been tried, we would have no difficulty in finding reversible error, but we must consider this case in its proper perspective. Here orders were given by a superior officer and ▉▉▉▉▉▉ ▉ a noncommissioned officer, and they are presumed to have been legal. In that setting, the burden is on the accused to establish any illegality. He can, of course, rely on the Government's evidence for that purpose, and if it, or other testimony, establishes a violation of the Code and Manual provisions, then he has carried his burden. We must, therefore, ascertain whether the record affirmatively establishes that, ▉▉▉▉▉▉ ▉ if he had complied with the two orders issued by the stockade officials, he would have thereby been subjected to punishment within the meaning of Article 13, supra. While the history of that Article of the Code supplies us with no test for determin-

**768**

ing when an unsentenced prisoner has been "subjected to punishment or penalty other than arrest or confinement upon the charges pending against him," we are sure that Congress contemplated a realistic approach by stockade officials to the utilization of military manpower. All servicemen, confined or otherwise, can be gainfully used, but to what extent unsentenced prisoners can be ordered to work on projects with sentenced prisoners without offending against Article 13 is not made clear. However, a close examination of the 1949 and 1951 Manuals for Courts-Martial, as well as other expressions in this area, affords a possible answer.

Previously in this opinion, we noted that Article of War 16, supra, was the first enactment which specifically provided that unsentenced prisoners should not be subjected to punishment or penalties, other than confinement. In order to ascertain the general understanding of that Article of War at that time, and to learn the opinion of the men who drafted the Manual and their interpretation of the manner in which the Article should be applied, we refer to the discussions held contemporaneously with the publication of the 1949 Manual. See Seminars Presented During the Orientation Conference on the Manual for Courts-Martial, U. S. Army, 1949, pages 101–102. When paragraph 19, quoted supra, of that Manual was under discussion by its draftsmen, the question was asked: Can a soldier under a sentence which has not yet been approved be employed on a work detail with soldiers who are undergoing punishment? Thereupon, the following explanation was offered:

". . . Under the provisions of Article 16 a soldier cannot be punished, other than by confinement, prior to the time his sentence is approved by the reviewing authority. Prior to such time the accused cannot be required to perform work that constitutes punishment or put on any work detail with prisoners who are undergoing punishment. The interpretation is that such work in the same detail with prisoners who are undergoing punishment, who are working supposedly at hard labor,

cannot properly be interpreted to be military duty—it is punishment, if performed with prisoners who are undergoing punishment.

"Q. Suppose there are two details, one detail with people having been sentenced and working at hard labor, and one detail with people whose sentences have not been approved and detailed at, say kitchen police?

"A. Kitchen police detail is a military duty. Cutting the grass is another. Although the actual work may be the same, if required to be done with prisoners being .punished by hard labor it ceases to be a mere military duty and becomes punishment. It is perhaps a fine line of distinction, but we have to draw such lines at times.".

The view expressed above, that work performed on a detail with sentenced prisoners is punishment, is not a novel one, particularly when the duties performed are identical. Indeed, as early as 1904, Davis, in his Treatise on Military Law, 2d ed, page 485, wrote:

"The work which may be required of soldiers in arrest is determined by paragraph 907, Army Regulations of 1895. Under the regulation as thus established, soldiers in confinement awaiting action on the proceedings of their trials are assimilated to those awaiting trial, and both classes may, at the discretion of the commanding officer, be employed, separately from prisoners undergoing sentence, upon such labor as is habitually required of soldiers. More severe or other labor would not be legal, nor would labor with a police party consisting in whole or in part of men under sentence however slight their sentence might be."

Colonel Winthrop's Military Law and Precedents, 2d ed, 1920 Reprint, advances the same principle for it states, at pages 124–125:

"A prisoner is to be presumed to be innocent till duly convicted, and till thus convicted, he cannot legally be punished as if he were guilty or probably so. The arrest by confinement of an enlisted man with a view

to trial and for the purposes of trial is wholly distinguished from a confinement imposed by sentence. It is a temporary restraint of the person, not a punishment, and should be so strict only as may be necessary properly to secure the accused. Anything further is unauthorized. . . .

"Neither hard labor nor severe service should be exacted of a soldier while remaining in arrest. *Enlisted men in confinement awaiting trial or sentence should not be assimilated in their treatment to those under sentence, or required to perform labor with them.* They should, however be given proper exercise, and may be put on drill or other light duty." [Emphasis supplied.]

Early official regulations of the Department of the Army that pertain to the subject of employment of unsentenced prisoners are of some added significance. One of the first publications states unequivocally that enlisted men in confinement awaiting trial will not be sent out to work with prisoners undergoing sentence. AR 999 (1889). The same prohibition appears in the regulations from 1895 until 1913, changed only by a qualifying phrase that would permit confinement officers to place both groups of prisoners together if such a procedure was unavoidable. See AR 907 (1895). Subsequent regulations dealing with prisoners in confinement are silent in regard to this problem, but a recent regulation governing the inspection of installation guardhouses and stockades by inspectors general lends support to the view that the earlier Army doctrine has not been modified. Section V, paragraph 12b, SR 20–10–3, dated November 28, 1949, provides that the inspecting officer should determine whether prisoners not serving sentences are segregated from sentenced prisoners on police, fatigue, and work details, and whether the serviceman awaiting trial—if he is ordered on a detail—has been placed there to punish or penalize him. That regulation is a recognition by Army authorities that punitive assignments are illegal, and that confinement officials should, if reasonably possible, order unsentenced prisoners to work

separate and apart from persons serving a term of confinement.

## IV

In developing this subject, we cannot disregard the argument that provisions of AR 600–375, dated January 6, 1948, are authority for the proposition that the two classes of prisoners can be treated alike. It provides as follows:

"Garrison prisoners other than privates, first class, and privates, will not perform military duties or labor except military police of quarters and employment, appropriate to their grade, in prisoners' messes." [Paragraph 17d(2), July 3, 1922, May 19, 1923; paragraph 18(2), March 31, 1923; November 24, 1942; paragraph 20d(2), May 17, 1943; paragraph 27 e(2), January 6, 1948, AR 600–375.]

Since the regulations define "garrison" prisoners to include those awaiting trial, it is obvious that the quoted provisions exempt noncommissioned officers in confinement from work of any sort, except police of quarters and mess duty. It is argued that, by implication, the regulation authorizes confinement officers to require privates and privates first class, sentenced or unsentenced, to perform any type of duty or labor. Even were we to concede that such a contention is tenable, there is no suggestion in the regulation that, even if both classes of prisoners can be required to perform the same type of military duties or labor, they can also be required to work as part of the same gang under the same hours, conditions, armed guard and disciplinary supervision. There is good reason for the Regulation's silence on that score, for such an interpretation would render Article 13 of the Uniform Code, and its supplementing Manual provisions, meaningless. Moreover, the purpose and objective of the statute would be defeated, and Army regulations must fall if they would bring about that result. Certainly, the views expressed by us find support in military regulations, customs, and precedents, and they must have been shared by the framers of the 1951 Manual for Courts-Martial. In fact, the Manual

**770**.

interpretation of Article 13 repudiates any extension of Government counsel's argument, for it prescribes that unsentenced prisoners "will not be required to observe either duty hours or training schedules devised as punitive measures, nor required to perform punitive labor." Manual for Courts-Martial, United States, 1951, paragraph 125, supra.

## V

From what has been said, it should be apparent that the crucial determination in this case is whether ▆ the circumstances and conditions surrounding the giving of the order show that the accused was being punished. In order to make that determination, several factors must be considered, and while they may not be all-inclusive, we believe the important ones can be accentuated by posing the following questions: (1) Was the accused compelled to work with sentenced prisoners? (2) Was he required to observe the same work schedules and duty hours? (3) Was the type of work assigned to him normally the same as that performed by persons serving sentences at hard labor? (4) Was he dressed so as to be distinguishable from those being punished? (5) Was it the policy of the stockade officers to have all prisoners governed by one set of instructions? (6) Was there any difference in the treatment accorded him from that given to sentenced prisoners?

Considering the first factor, the record shows that the stockade officer placed the accused on work ▆ details with prisoners serving sentences, without any discernible reason other than possible convenience. Certainly the inference is compelling that the sentenced members of the work detail were being subjected to punishment, for it is the primary function of confinement officials to insure the serving at hard labor of sentences given as punishment. We recognize, of course, that the term "hard labor" has its origin in historic penology, and that the labor required of present-day prisoners is often no more strenuous than the cutting of

grass or leaf raking. Nevertheless, when the work is performed by sentenced prisoners under armed guard, we must conclude that they are being punished in compliance with the sentence imposed. Therefore, if an unsentenced prisoner works under identical conditions, it is fair to assume he, too, is being punished. Such an assumption becomes stronger if the other factors are present, and here they were. All stockade personnel wore the same garb; the accused was required to mingle on the job with sentenced prisoners; all prisoners were accorded identical treatment; and the stockade policy was to govern all by one set of working standards. Surely under those conditions, all prisoners became mere numbers without distinction or difference.

Government counsel press on us the argument that if the task assigned to an unsentenced prisoner could have been required of any serviceman, then the work cannot be considered as punishment. While it may sound persuasive when first advanced, that theory is so all-inclusive as to be of no value as a yardstick. When the principle is really scrutinized, it fails, because it is difficult to conceive of any type of honest work that could not be required of a basic soldier on active duty. For example, if a road building project required the use of army personnel to break rocks into gravel, we certainly would not say that a commanding officer is forbidden to order his men to perform duties in a rock quarry. Again, any enlisted man can be used to improve his company area. On the other hand, a stockade official might run afoul of the law if, in order to teach an unsentenced prisoner that crime does not pay, he ordered the suspect to the rock pile to advance his education. Similar hypothecations without number could be made, all leading to the conclusion that the theory advanced by the Government is of little assistance.

## VI

After a careful analysis of the facts in this record, we conclude the orders were illegal as a matter of law. To establish the point, we will marshal our arguments separately with respect to each charge. The facts of the first incident disclose that the accused refused to return to work on a ditch with a sentenced prisoner who was identically dressed. Both he and his convicted fellow-worker were wearing white bands around their arms, in direct contravention of current regulations, which require that sentenced prisoners be distinguished by a block letter "S" on their white arm bands. The regulation was known but ignored, and so, apparently, was the Code provision, as there seems to have been a belief prevalent in that stockade that it was permissible to treat all prisoners in the same manner. The work assignment sergeant had made up the ditch-digging work detail to which the accused was assigned, and he admitted that he had made the assignments with knowledge that sentenced and unsentenced prisoners would be working together. Furthermore, we find that other stockade personnel made no distinction between the classes of individuals confined. For instance, the confinement officer admitted that, under his direction of the stockade, there was no difference in the type of work required of both sentenced and unsentenced prisoners. Against this array of facts we do not find a single circumstance tending to show that the accused was accorded any consideration not shown sentenced prisoners. To permit military authorities to commingle sentenced and unsentenced prisoners, and deal with them equally, would indeed require an unsentenced prisoner to serve a sentence before conviction. Thus, in reviewing the evidence relating to the first charge, we find that compliance with the order would have required the accused to perform the same work, under the same conditions, in the same uniform, and without distinction or difference from one who was being punished. If the sentenced prisoner was being punished—and we must assume he was—a fortiori, the accused was being punished. It follows that the order to return to work was an order given to continue that illegal punishment. Accordingly, we hold that the order forming the basis of Charge I was illegal.

Turning to the circumstances surrounding the giving of the order which forms the basis of the second charge, we reach a similar conclusion. The record shows that the accused was a member of a regular post improvement detail, assigned to break and carry rocks from the quarry. The squad of twelve to fifteen prisoners arrived on the job by truck at twenty minutes to eight, shortly after the normal working hours for prisoners had begun. All of the prisoners were required to break rock, except the accused and one other man, who were ordered to load rocks on a wheelbarrow and to carry them to a rock pile. Although the sergeant in charge testified that he was the only supervisor, defense counsel on cross-examination elicited the information that all of the prisoners were working under guard. No attempt was made by the prosecution at the trial to show some unusual necessity for that type of hard labor, or to justify the imposition of such heavy work upon a man who not only had not been sentenced, but who had not even appeared before a court-martial to answer the charges against him. The very nature of the work suggests it to have been punitive, especially in view of the stockade work policy, and if the accused was not being punished, then a considerable number of sentenced prisoners were escaping the effect of their sentences. While we do not expect stockade officials to personalize the work of every pretrial occupant of the stockade, we do insist that some reasonable effort be made by them to meet the conditions imposed by military law. Practical considerations may narrow the difference between classes of prisoners, but some consideration must be given to a person who has not been tried for his alleged crime.

We are sure that the defense relied on in this case was not the product of an afterthought on trial, or on appeal, for paragraph 11 of the investigating officer's report contains the following explanatory note:

"Under Article 13, Uniform Code of Military Justice, it specifically states that the arrest pending trial, 'should not be any more rigorous than the circumstances require to insure his presence'. Pvt Bayhand was made to work with other prisoners on work details and thus came to feel that he was being subjected to the treatment of a sentenced prisoner. The resentment caused by this was a major factor at the time of his refusal to work."

Thereafter in the report, the investigating officer recommended that the offense alleged in Charge II be dropped because of insufficient evidence, but again we find a Staff Judge Judge Advocate who failed to mention the favorable recommendation in his letter of advice to the convening authority. See United States v Greenwalt, 6 USCMA 569, 20 CMR 285. We cannot say that the commander was not informed verbally, but staff judge advocates would prevent any question from being raised if their written advice reflected that the recommendation was called to the attention of the officer charged with the responsibility of ordering trial. We recognize, of course, that the quoted language from the investigating officer's report cannot be substituted for the evidence contained in the record, but it prophesied accurately the situation that was later developed at trial.

By our holding in this case, we do not mean to suggest that unsentenced prisoners must remain unemployed. The Code speaks for itself, and we are certain persons awaiting trial can be required to perform useful military duties to the same extent as a soldier available for general troop duty. However, it appears to us that when a man who is presumed innocent is ordered to work on a rock pile, in company with those who have been tried and sentenced for crime, the presumption is worth little, for he is already being punished. Even the type of work selected smacks of the traditional means of punishing convicted felons, and while that alone is not sufficient to support a finding of punitive employment, when it is taken together with the other facts shown in this record, it reaches that level as a matter of law. Surely, it is not asking too much to require those in command of stockades to exercise sufficient

ingenuity in allocating tasks to those who have not been convicted so as to comply with both the letter and spirit of the law. Even though it may take some additional man-hours of guarding to segregate classes of prisoners, Congress has decreed that, until convicted, one charged with a crime shall not be subjected to punishment, and we must enforce that edict.

The decision of the board of review is reversed, and the charges are dismissed.

Chief Judge QUINN concurs.