UNITED STATES, Appellee

v

HALVAH M. PHILLIPS, Private First Class,
U. S. Army, Appellant

18 USCMA 230, 39 CMR 230

*Captain Dennis R. Hunt* argued the cause for Appellant, Accused. With him on the brief were *Colonel Daniel T. Ghent* and *Major David J. Passamaneck.*

*Captain William R. Steinmetz* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel David Rarick, Major R. Kevin McHugh, Major Edwin P. Wasinger,* and *Captain Joel P. Schiff.*

## Opinion of the Court

QUINN, Chief Judge:

A general court-martial convicted the accused of unauthorized absence of approximately nine and one-half months and willful disobedience of an order to participate in a work detail, in violation of Articles 86 and 90, Uniform Code of Military Justice, 10 USC §§ 886 and 890, respectively. It sentenced him to a dishonorable discharge, forfeiture of all pay and allowances, and confinement at hard labor for eighteen months. Intermediate authorities affirmed, and the accused brought the case to this Court alleging that the order to participate in the work detail was illegal.

Pending determination of a charge predicated upon his unauthorized absence, the accused was confined in the stockade at Fort Dix, New Jersey. On the night of the incident that gave rise to the disobedience charge, he was quartered in Cellblock 79, a "troop barracks type of building." About 8:30 p.m., Major Wilbur E. Ford, Junior, the confinement officer, accompanied by the Provost Sergeant, George G. McCarthy, and the Assistant Provost Sergeant, Jerry E. Smith, went to the cellblock to investigate a report that prisoners were constructing a tunnel in the stockade. Surveillance during the day had proved fruitless, and it was decided to make a direct search. Smith and McCarthy crawled into a space under the building, and, after some searching, discovered the tunnel entrance under a

cover of sand and boards. They entered the tunnel. According to their observations, the tunnel was about three feet in diameter, with the floor approximately nine feet below ground level. The tunnel extended outward about twenty feet, toward "the wire," but there was a substantial distance "to go before they would have been outside the fence." The soil was "sandy," and McCarthy "did not want to take a chance of having it cave in," so they did not explore the full limits of the tunnel.

On receiving a report from the Sergeants, Major Ford entered the cellblock and had all the prisoners assembled and formed into two ranks. It was about the hour for holding bedtime head count, for which there were no dress regulations, so the prisoners appeared in various stages of undress. There were about sixty. Major Ford announced that the tunnel had been found. He described it as a "safety hazard." He thought there was "a very good possibility of a cave in," so he deemed it essential to fill in the tunnel "immediately." He asked those who had participated in digging the tunnel to volunteer to fill it. No one volunteered. As a result, he ordered the "first eight men in the first rank, on the left" to fill the tunnel. Government and defense witnesses disagree as to what transpired from this point. For purposes of this appeal, it is sufficient to note that, from the evidence, the court-martial

232

could conclude beyond a reasonable doubt that the accused was directly and personally ordered by Major Ford to get dressed and help fill the tunnel, and the accused willfully refused.[1]

Although not precisely worded, a stipulation admitted in evidence indicates that at least three of the prisoners on the tunnel detail were sentenced prisoners. Judicial notice was taken of the provisions of an Army regulation prohibiting the commingling of sentenced and detained prisoners on the same work details. Pertinent parts of the regulation, AR 210–181, captioned "Installations, Stockades and Hospital Prisoner Wards," are set out in the Appendix. Major Ford testified he knew that, under the regulation, sentenced and detained prisoners were not to perform "the same work details together." He further testified that, in practice, the regulation was construed to apply only to "customary work . . . outside" the stockade, for details formed "from work call formations in the morning and afternoon." He maintained he did not regard the tunnel as presenting a "normal" work situation; he acknowledged that it did not represent an "emergency," but he insisted it was "unusual." He admitted he did not know, and he made no inquire to determine, the custody status of the persons he ordered to fill the tunnel.

A person in confinement awaiting disposition of charges against him cannot be "subjected to ▮ punishment or penalty," other than the confinement, except "minor punishment . . . for infractions of discipline." Article 13, Code, supra, 10 USC § 813. A prisoner awaiting trial who is required to perform work assigned to sentenced prisoners, as execution of their sentences, is subjected to punishment in violation of Article 13. United States v Bayhand, 6 USCMA 762, 21 CMR 84, and United States v Nelson, 18 USCMA 177, 39 CMR 177. Consequent-

ly, a prisoner does not violate Article 90 of the Uniform Code if he refuses to obey an order to work with sentenced prisoners on a detail to which they have been assigned as execution of their respective sentences to hard labor. United States v Bayhand, supra. However, a prisoner in confinement, who has not been discharged, is still a member of the armed services and is still subject to lawful orders, whether he is sentenced or unsentenced.

At trial, defense counsel argued that, "as a matter of law," the assignment of a detained prisoner to "the same work detail" as sentenced prisoners for performance of work "under the same conditions" as the sentenced prisoners "punishes a detained prisoner" and is illegal under the provisions of Article 13, Code, supra. On that basis he moved to dismiss the disobedience charge. The motion was denied. Appellate defense counsel contend the law officer misconstrued the defense argument in that it went beyond Article 13 to include the separate and categorical prohibition against commingling detained and sentenced prisoners contained in AR 210–181. The regulation, say appellate defense counsel, is broader than Article 13 in that it forbids assignment of unsentenced prisoners to any work detail containing sentenced prisoners, regardless of whether the work is contemplated as hard labor in execution of a sentence. We need not determine the scope of defense counsel's trial argument. The regulation is part of the record of trial, and it speaks for itself. We consider, first, therefore, the present contention that the regulation categorically forbids assignment of sentenced and unsentenced prisoners to perform any activity involving manual labor, regardless of the nature and the purpose of the activity.

From Major Ford's testimony, it is apparent that the confinement officials construed the regulation as applying only to "customary work," for which

---

[1] Apparently, the accused believed the order was unfair to him because he had been assigned to Cellblock 79 only a few days before, and he had had "no part in digging" the tunnel.

details were formed from regular work call formations. The practical construction accorded a regulation by those charged with its administration is not necessarily determinative of its legal meaning, but it is entitled to great weight. United States v Robinson, 6 USCMA 347, 20 CMR 63. The administrative construction is especially creditable when the statute or regulation is primarily concerned with procedures for the organization and management of the administrative body. Thus, one of the provisions regarding work assignments is that the assignments be made "by *specifying daily* certain types of work for detained and adjudged prisoners and a different type for sentenced prisoners." (Emphasis supplied.) AR 210–181, paragraph 35*h*(1). Does this statement mean that every prisoner can refuse to work if the work assignment was made on a biweekly, rather than a daily, basis? The provision appears to be no more than an instruction to confinement personnel, which, if not carried out, would subject those charged with preparation of work assignments to the disapprobation of their superiors, but would not invalidate the work assignments and relieve the prisoners from the obligation to comply with work orders. See United States v White, 17 USCMA 211, 214, 38 CMR 9. We have analyzed the regulation, and we are convinced that the administrative construction accords with its language and purpose.

The regulation directs development of work programs that would be "most beneficial" to the prisoners and "consistent with the labor needs of the installation." One of the anticipated results of such "constructive programs" is minimization of the "loss of services" which occurs when persons are confined. The work designated as appropriate for the work program is described as "support-type functions." The phrase is not specifically defined, but the general purposes of the regulation indicate it is intended to apply to tasks helpful to the usual routine and needs of the post. What

234

the regulation contemplates, therefore, is a planned program of work, involving a variety of jobs designated on separate "work assignment rosters" for different categories of prisoners. AR 210–181, paragraph 35*g*, *h*(1). Plainly, emergency situations were not envisaged by the draftsmen of the regulation. Neither the language nor the purposes of the work provisions even suggest, for example, that if an explosion destroyed part of the stockade, and men were needed to pull apart debris to reach persons trapped in the wreckage, that an order to all prisoners to work together to remove the debris would violate the prohibition against commingling. Tacitly, appellate defense counsel appear to acknowledge the inapplicability of the regulation to emergency work situations, but they contend there was no urgency in the tunnel project. We need not decide that question. As we read it, the regulation was intended, as it has been administratively construed, to apply only to the "customary" work program of the stockade. Extraordinary or unusual work situations, whether or not describable as emergencies, are not within its reach.

Appellate defense counsel contend that the question whether a particular task is routine or extraordinary, so as to be within or outside the purview of the regulation, should have been submitted to the court members as a question of fact for their determination. The argument misconceives the nature of the question. What is involved in a construction of the regulation, which is a question of law. In United States v Carson, 15 USCMA 407, 408, 35 CMR 379, we said: "Whether an act comports with law, that is, whether it is legal or illegal, is a question of law, not an issue of fact for determination by the triers of fact." In the absence of any evidence to indicate that the job was treated as a routine assignment in the standard work program, the task of filling in a tunnel secretly constructed by prisoners for the purpose of escape is not, in our opinion, the kind of work contemplated by the regulation to re-

quire separate assignments of sentenced and unsentenced prisoners. We conclude, therefore, that no question of fact involving the regulation was raised at trial which required submission to the court members for their determination. Cf. United States v Penn, 18 USCMA 194, 39 CMR 194.

We turn now to the prohibition against punishment of an unsentenced prisoner in confinement. ■■■■■■ ■ The character of work as punishment does not depend upon whether it is part of a customary work program or is extraordinary and singular. Unusual and nonrecurrent work may be assigned to a sentenced prisoner as hard labor in execution of his sentence, just as common and long-continued tasks may be given to him. The assignment of tasks in execution of a sentence rests largely within the discretion of the confinement officials.[2] See United States v Dunn, 9 USCMA 388, 390, 26 CMR 168; United States v Bayhand, supra, at pages 772–773. In Bayhand, at page 771, we indicated that work "performed by sentenced prisoners under armed guard" is presumptively work "in compliance with the sentence imposed" upon them, that is, the work is punishment. We further indicated that to require an unsentenced prisoner to perform the same work as sentenced prisoners, in their company and subject to the same conditions, justifies the conclusion that the work is also punishment for the unsentenced prisoner. Such punishment is a violation of Article 13. United States v Nelson, supra. In Bayhand, the nature of the tasks and the conditions under which they were performed compellingly indicated the work was punishment; we, therefore, concluded that the orders directing the accused, an unsentenced prisoner, to perform the work were illegal. No such certainty of proof is present in this case.

Major Ford's testimony indicates that the assignment to fill in the tunnel was not devised as ■■■■■■ ■ work in execution of a sentence, but to eliminate as speedily as possible a safety hazard within the walls of the stockade. He regarded the situation as "unusual" and not part of the regular work program. Since the hazard had apparently been created by the prisoners housed in Cellblock 79, he thought it appropriate that the same persons remove the hazard. Unlike the jobs assigned to the accused in Bayhand, the work was not of a kind commonly associated with the execution of a sentence at hard labor. These factors are strong counterweights to the inference that the work was assigned as punishment because sentenced prisoners were included in the work detail. The ultimate question, that is, whether the work was punishment, depended upon the weight assigned to different aspects of the evidence. A question of fact, therefore, was present for the court members' consideration. See United States v Ornelas, 2 USCMA 96, 6 CMR 96. The law officer recognized the issue and submitted it to the court members, with appropriate instructions. They resolved the question against the accused, and there is ample evidence to support their verdict.

The decision of the board of review is affirmed.

Judge DARDEN concurs.

FERGUSON, Judge (dissenting):

I dissent.

In the case at bar, when stockade officials discovered the existence, within the stockade, of a partially-completed escape tunnel, the confinement officer, Major Ford, ordered the assembly of all of the cellblock prisoners. Sentenced and unsentenced prisoners alike, who were quartered in the cellblock, lined up in two ranks. Major Ford announced the discovery and directed those involved in the digging to step forward. Receiving no re-

---

[2] Certain tasks, such as those requiring access to narcotics, are prohibited by regulation. AR 633–5, Ap- prehension and Confinement, paragraph 23, July 8, 1965.

sponse he repeated the directive, again with negative results. He then ordered "the first eight men in the front rank, on the left, fall out for detail to fill in the tunnel. I then instructed Sergeant Smith to fall the men out and fill in the tunnel." The accused, an unsentenced prisoner,[1] objected to participation in this activity. He told the Sergeant that he had only been in the cellblock two days, he had nothing to do with digging the tunnel and he was not going to fall out and fill it in. The Major testified that when he heard this he gave the accused a direct order to "fall out for detail and fill in the tunnel," and when the accused stated he was not going to comply, the Major directed the Sergeant to place the accused in segregation for refusing to comply with his order. This is the basis for the accused's conviction under Article 90, Uniform Code of Military Justice, 10 USC § 890 —willful disobedience of a *lawful* command of a superior officer.

My brothers believe this to be a valid order, unless it was given as a form of punishment, on the ground that it was not work of a kind commonly associated with the execution of a sentence at hard labor, despite the evidence that at least three of the prisoners on the tunnel detail were sentenced prisoners. Since the issue of whether the work was punishment was submitted to the court members, under instructions of the law officer, to be decided as a question of fact, they hold that there was ample evidence to support the verdict. I disagree as to their view of the nature of the work involved.

Article 13, Code, supra, 10 USC § 813, provides:

"**Art. 13. Punishment prohibited before trial.**

"Subject to section 857 of this title (article 57),[2] no person, while being held for trial or the result of trial, may be subjected to punishment or penalty other than arrest or confinement upon the charges pending against him, *nor shall the arrest or confinement imposed upon him be any more rigorous than the circumstances require to insure his presence,* but he may be subjected to minor punishment during that period for infractions of discipline." [Emphasis supplied.]

In United States v Bayhand, 6 USCMA 762, 21 CMR 84, we reviewed the history of this Article, including military Manuals and Directives, in order to determine the intent of the Congress in the enactment thereof. As we there stated, at page 768, with reference to Article 13, Code, supra:

". . . the conclusion is inescapable that Congress, the framers of the Manuals for Courts-Martial, and the Army must have recognized that gross injustices might result from any confinement system in which one accused of crime was treated no better than one proved guilty. Therefore, to eliminate any and all forms of punishment prior to trial, except that which is inherent in all confinement, laws and regulations were enacted to protect the untried confinee. It must be remembered that *the only valid ground for ordering confinement prior to trial is to insure the continued presence of the accused,* as where he has earlier indicated that his obligation to remain with his unit weighs lightly with him, or where the seriousness of the offense alleged is likely to tempt him to take leave of his surroundings.

". . . While the history of that Article of the Code supplies us with no test for determining when an unsentenced prisoner has been 'subjected to punishment or penalty

---

[1] Accused was confined on charges of being absent without leave for which he was also convicted at this trial.

[2] Article 57, Uniform Code of Military Justice, 10 USC § 857, deals with the "Effective date of sentences." Its provisions are not pertinent to a resolution of the issue in this case since the accused was an unsentenced prisoner.

other than arrest or confinement upon the charges pending against him,' we are sure that Congress contemplated a realistic approach by stockade officials to the utilization of military manpower. All servicemen, confined or otherwise, can be gainfully used, but to what extent unsentenced prisoners can be ordered to work on projects with sentenced prisoners without offending against Article 13 is not made clear. However, a close examination of the 1949 and 1951 Manuals for Courts-Martial, as well as other expressions in this area, affords a possible answer.

"Previously in this opinion, we noted that Article of War 16, . . . [10 USC (1946 ed, Supp IV) § 1487], was the first enactment which specifically provided that unsentenced prisoners should not be subjected to punishment or penalties, other than confinement. In order to ascertain the general understanding of that Article of War at that time, and to learn the opinion of the men who drafted the Manual and their interpretation of the manner in which the Article should be applied, we refer to the discussions held contemporaneously with the publication of the 1949 Manual. See Seminars Presented During the Orientation Conference on the Manual for Courts-Martial, U. S. Army, 1949, pages 101–102. When paragraph 19, quoted supra, of that Manual was under discussion by its draftsmen, the question was asked: Can a soldier under a sentence which has not yet been approved be employed on a work detail with soldiers who are undergoing punishment? Thereupon, the following explanation was offered:

'. . . Under the provisions of Article 16 a soldier cannot be punished, other than by confinement, prior to the time his sentence is approved by the reviewing authority. Prior to such time the accused cannot be required to perform work that constitutes punishment *or put on any work detail with prisoners who are undergoing punishment,*

*The interpretation is that such work in the same detail with prisoners who are undergoing punishment, who are working supposedly at hard labor, cannot properly be interpreted to be military duty — it is punishment, if performed with prisoners who are undergoing punishment.*

'Q. Suppose there are two details, one detail with people having been sentenced and working at hard labor, and one detail with people whose sentences have not been approved and detailed at, say kitchen police?

'A. Kitchen police detail is a military duty. *Cutting the grass is another. Although the actual work may be the same, if required to be done with prisoners being punished by hard labor it ceases to be a mere military duty and becomes punishment. It is perhaps a fine line of distinction, but we have to draw such lines at times.'*

"The view expressed above, that work performed on a detail with sentenced prisoners is punishment, is not a novel one, particularly when the duties performed are identical. Indeed, as early as 1904, Davis, in his Treatise on Military Law, 2d ed, page 485, wrote:

'The work which may be required of soldiers in arrest is determined by paragraph 907, Army Regulations of 1895. Under the regulation as thus established, soldiers in confinement awaiting action on the proceedings of their trials are assimilated to those awaiting trial, and both classes may, at the discretion of the commanding officer, be employed, separately from prisoners undergoing sentence, upon such labor as is habitually required of soldiers. More severe or other labor would not be legal, nor would labor with a police party consisting in whole or in part of men under sentence however slight their sentence might be.'

**237**

Colonel Winthrop's Military Law and Precedents, 2d ed, 1920 Reprint, advances the same principle for it states, at pages 124–125:

'A prisoner is to be presumed to be innocent till duly convicted, and till thus convicted, he cannot legally be punished as if he were guilty or probably so. The arrest by confinement of an enlisted man with a view to trial and for the purposes of trial is wholly distinguished from a confinement imposed by sentence. *It is a temporary restraint of the person, not a punishment, and should be so strict only as may be necessary properly to secure the accused. Anything further is unauthorized. . . .*

'Neither hard labor nor severe service should be exacted of a soldier while remaining in arrest. *Enlisted men in confinement awaiting trial or sentence should not be assimilated in their treatment to those under sentence, or required to perform labor with them.* They should, however be given proper exercise, and may be put on drill or other light duty.' " [Emphasis partially supplied.]

In pursuance of Article 13, AR 210–181, change 3, paragraph 35*h*(1), January 17, 1963, provides:

"*h. Work limitations.* Prisoners normally will be detailed to work on support-type functions subject to the limitations prescribed below.

(1) Prisoners may be required to perform useful work to the same extent as soldiers available for general troop duty. *Detained and adjudged prisoners will not be commingled with sentenced prisoners on work details and they will be segregated on work assignments by specifying daily certain types of work for detained and adjudged prisoners and a different type for sentenced prisoners.* Further segregation will be accomplished by separation on work assignment rosters. An officer or noncommissioned officer prisoner will be required to perform only work which is normally performed by an officer or noncommissioned officer of his rank or grade." [Emphasis supplied.]

In the case at bar, Major Ford testified that he believed the above-noted regulation applied only to the "customary" work programs of the stockade and not to the "unusual" situation presented by the unfilled tunnel. He agreed that it did not constitute an "emergency." He also testified that he did not know, and made no inquiry to determine, the custody status of the persons he ordered to fill the tunnel.

My brothers agree that the regulation was intended to apply only to "customary" work programs of the stockade and hold that extraordinary or unusual work programs are not within its reach.[3]

In my view, my brothers' concurrence in the administrative determination by stockade officials of the intent of the regulation is their basic error. The Army Regulation was intended to provide guidelines for those responsible for the maintenance of prisoners, both sentenced and unsentenced. It could not direct procedures in conflict with the law any more than can the Manual for Courts-Martial, United States, 1951 (see Tedrow, Digest, Annotated and Digested Opinions, U. S. Court of Military Appeals, Manual for Courts-Martial, pages 643–651), which, at least, has the force of law. United States v Smith, 13 USCMA 105, 32 CMR 105. Any determination that it did is, of course, in error.

Article 13, Code, supra, expressly prohibits any punishment or *penalty*, of an unsentenced prisoner, other than arrest or confinement and the imposition of the latter shall not be more rigorous than the circumstances require to insure his presence. The Manual, supra, paragraph 125, prescribes that unsentenced prisoners

---

[3] My brothers' makeweight example of an emergency (stockade explosion) is simply not in point for Major Ford specifically testified that the unfilled tunnel did not represent an emergency.

238

"will not be required to observe either duty hours or training schedules devised as *punitive* measures, nor required to perform *punitive* labor." (Emphasis supplied.)

When Major Ford had the prisoners assembled in the cellblock, about 8:30 p. m., it was the hour for holding bedtime head count. The day's work was done. Since there were no dress regulations for this procedure, the prisoners appeared in various stages of undress. His fruitless efforts to ascertain the identities of those who dug the tunnel resulted in an order which can only be regarded as *punitive*, especially in view of the hour and the circumstances. Since no emergency presented itself, no reason, other than punitive, existed for ordering the work to be done *at that time*. The men could have been sent to their cells and the filling of the tunnel scheduled for the next day. There is simply no evidence that this accused committed any infraction of discipline for which punitive action might have been appropriate.

The Major further compounded his error by ordering sentenced and unsentenced prisoners alike to work together. Even if this be considered as military duty, which I doubt, the order was illegal under the Army's own interpretation. As we noted in United States v Bayhand, supra, at page 769:

"'. . . Kitchen police detail is a military duty. Cutting the grass is another. Although the actual work may be the same, if required to be done with prisoners being punished by hard labor it ceases to be a mere military duty and becomes punishment. It is perhaps a fine line of distinction, but we have to draw such lines at times.'"

Since I believe the Major's order to be in contravention of the provisions of Article 13, Code, supra, hence, illegal, I would reverse the conviction on this issue and dismiss the Charge. In view of the disparity between the maximum imposable penalty for the remaining offense (one year) and the offenses for which accused was convicted (six years), I would order a rehearing on sentence.

APPENDIX

"Changes in force: C 1 and C 3

AR 210–181
*C 3

INSTALLATIONS
STOCKADES AND HOSPITAL
PRISONER WARDS

CHANGES } HEADQUARTERS,
No. 3 } DEPARTMENT OF THE ARMY
} Washington 25, D. C.,
} 17 January 1963

AR 210–181, 24 September 1957, is changed as follows:

• • • • •

Section III (Superseded)
TRAINING and WORK

35. General. *a. Objectives.* Objectives established for work and training programs for prisoners must insure that, consistent with correctional treatment, prisoners are fully occupied with intensive training and useful work projects. Combined training and work programs must not be less arduous and demanding than those prescribed for soldiers in garrison duty status. Employment and training activities prevent idleness among prisoners, improve their skills, assist them in rehabilitation, and alleviate custodial problems. The combined training and work programs for potentially restorable prisoners and those considered nonrestorable for further military service will consist of 63 hours each week. A 40-hour workweek for the employment of prisoners will be the minimum.

• • • • • •

*g. Work programs.* Work programs in conjunction with correctional treatment principles require that prisoners be employed in work projects that are most beneficial to them, and are consistent with the labor needs of the installation. The loss of services which occurs when persons are confined can be minimized through such construc-

---

* These changes supersede C 2, 27 June 1960.

tive programs. Physically qualified prisoners except those in administrative and disciplinary segregation will be required to engage in the work program.

*h. Work limitations.* Prisoners normally will be detailed to work on support-type functions subject to the limitations prescribed below.

(1) Prisoners may be required to perform useful work to the same extent as soldiers available for general troop duty. Detained and adjudged prisoners will not be commingled with sentenced prisoners on work details and they will be segregated on work assignments by specifying daily certain types of work for detained and adjudged prisoners and a different type for sentenced prisoners. Further segregation will be accomplished by separation on work assignment rosters. An officer or noncommissioned officer prisoner will be required to perform only work which is normally performed by an officer or noncommissioned officer of his rank or grade.

(2) Work will be constructive in nature and should contribute to the training objectives stated in *a* above for each type of prisoners. Prisoners not training for return to duty or restoration to duty should, whenever practicable, be assigned to jobs which will help to prepare them for return to civilian life.

(3) Prisoners will not be detailed on any projects classified as prohibited work under the provisions of AR 633–5.

(4) Prisoners will not be worked on projects which can be considered as placing them in competition with civilian labor other than within the boundaries of the Army installation.

(5) Care should be exercised to avoid mixed work details of minimum, medium, or maximum custody prisoners.

(6) The work of prisoners on Sundays and holidays will be limited to maintenance, mess, housekeeping, and other essential tasks, except in emergency situations.

(7) Working and guarding of prisoners will be in accordance with their custody grade set forth in paragraph 11.

(8) A prisoner will not be placed in any position wherein the discharge of such duties may reasonably be expected to involve the exercise of authority over other prisoners and will not be designated or referred to as a leader.

(9) The development of work projects to be conducted in fenced inclosures or other areas which permit good supervision and minimum custodial requirements is recommended.

36. Temporary release to organizations. Prisoners in minimum and medium custody grades may be temporarily released to their units for work and training in preparation for and participation in field training and field training exercises. Release of prisoners for this purpose should contribute to their successful association with the organization, and will provide excellent opportunities for deserving prisoners to prove their fitness for early return to duty. Such work and training activities are inducements toward rehabilitation and, where practicable, are encouraged. The unit commander will be responsible for the security, conduct, and welfare of prisoners from the time of their temporary release until return to the stockade."