UNITED STATES, Appellee

v.

Craig A. HUGHEY, Senior Airman
U.S. Air Force, Appellant.

No. 96–0798.
Crim.App. No. S28996.

U.S. Court of Appeals for
the Armed Forces.

Argued Dec. 4, 1996.

Decided June 9, 1997.

For Appellant: *Captain Michael L. McIntyre* (argued); *Colonel Jay L. Cohen* and *Colonel David W. Madsen* (on brief); *Lieutenant Colonel Kim L. Sheffield.*

For Appellee: *Lieutenant Colonel Michael J. Breslin* (argued); *Colonel Theodore J. Fink* (on brief); *Major Jane M.E. Petersen.*

*Opinion of the Court*

EFFRON, Judge:

Appellant was tried by a special court-martial on charges of violating Nellis Air Force Base Regulation (NAFBR) 111–2, "Misuse of Government Travel Charge/ATM Card" (19 Oct. 1993). At trial, appellant contended that the regulation was unlawful

and moved to dismiss the Charges and specifications. After the military judge denied the motion, appellant pleaded guilty to two specifications involving violation of this general regulation—by wrongfully using his American Express Government Travel Charge Card for other than official government business and by failing to pay the entire balance due on that card's account within the 25–day period prescribed by the regulation.[1] *See* Art. 92, Uniform Code of Military Justice, 10 USC § 892. Thereafter, the panel of officer and enlisted members sentenced appellant to a bad-conduct discharge and reduction to the lowest enlisted grade. The convening authority approved these results, and the Court of Criminal Appeals affirmed them in an unpublished opinion.

On appellant's petition, we granted review of the following issue:

> WHETHER THE MILITARY JUDGE ERRED IN FINDING THAT NELLIS AFB REGULATION 111–2 WAS A LAWFUL GENERAL REGULATION.

We hold that the military judge did not err.

## I

NAFBR 111–2 was issued by the base commander (Major General Griffith) on October 19, 1993, and was in effect at all times relevant to this case. The regulation, which provides that "[t]he card and account are not to be used for personal purposes . . . ," limits use of the card to obtaining cash advances and charging expenses "in connection with official United States Government business." Para. 1. The regulation prohibits "use [of] the card except while performing temporary duty or within 10 calendar days of the start or end of PCS [permanent change of station] or TDY [temporary duty] travel," with certain exceptions not relevant to this case. Para. 4c. The regulation also established a mandatory requirement that servicemembers "pay the entire balance within 25 days of the date of the bill." Para. 4a.

On March 23, 1994, appellant's unit issued him a United States Government American Express Card, provided under an exclusive contract between American Express Company and the federal government. The following was printed on the face of the card: "UNITED STATES GOVERNMENT, FOR OFFICIAL U.S. GOVERNMENT TRAVEL ONLY."

During the providence inquiry into his guilty pleas, appellant admitted that he had used the card improperly for personal purposes during the period May 18 to July 11, 1994. Specifically, he revealed that he had made cash withdrawals from ATMs "around the city" totaling "probably a few thousand" dollars to pay arrearages on his automobile loan in order to prevent the car's repossession. Additionally, he acknowledged using the card to pay for repairs to his automobile and for "other little things" such as "a deposit on a cellular phone" and to buy "[e]lectronics." He admitted that, "[b]y the agreement I signed to get" the card and from the "briefing" in his unit on the card's use, "I knew I shouldn't have been using it . . . for the purposes I was using it for."

Four billing statements from American Express on appellant's account were attached to the stipulation of fact. Dated May 26, June 26, July 27, and August 26, 1994, they showed "balance[s] due" of $618.54, $4,257.71, $11,239.37, and $11,239.37, respectively. Appellant indicated that none of the entries on these statements was "due from expenses for TDY purposes or government travel."

The statements also reflected that, through the date of the last statement, appellant had made no payment on the account. Appellant told the military judge that, apparently due to an incomplete address, he did not receive the May or June statements. When he did receive his first statement, however—at "either the very end of July or August"—he made no payment on it. Similarly, when he received the statement dated August 26, he made no payment. As of September 29, 1994—the date on which appellant was sentenced and 64 days after he received a bill with a balance of $11,239.37—

---

1. Upon motion by assistant trial counsel, the military judge dismissed three other related specifications after he had accepted appellant's guilty pleas as provident.

American Express still had received no payment on appellant's account.

Prior to entering his pleas at trial, appellant moved to dismiss the Charges and specifications for failure to state an offense on the grounds that the regulation was "unlawful." Appellant offered three arguments in support of the motion to dismiss.

First, he argued that the regulation did not sufficiently relate to any military duties, as demonstrated by the fact that use of the card was not mandatory, that it was provided for the convenience of the servicemember, and that the card could not be activated absent a private agreement between the servicemember and American Express. Second, he contended that the regulation unlawfully sought to increase punishment for delayed payment, as demonstrated by the fact that the maximum punishment for dishonorable failure to pay just debts under Article 134, UCMJ, 10 USC § 934, includes only 6 months' confinement, but the maximum confinement for violating a regulation is 2 years. Finally, appellant asserted that the regulation "unreasonably infringe[d] upon a private contractual agreement" between appellant and American Express, which provided payment terms less stringent than the regulation's requirement to pay the total account within 25 days of its billing. According to appellant, "This interference with ... a private agreement between AMEX and the individual is clearly beyond the scope of any government interest or military necessity."

After considering the views of the parties and related documentary evidence, the military judge entered into the record detailed findings of fact and conclusions of law, and he denied the motion.

## II

We review the military judge's findings of fact under a standard that requires us to accept those findings unless they are clearly erroneous, and we consider appellant's challenge to the lawfulness of the regulation *de novo*. Because the regulation was issued over the signature of an officer authorized to issue a general regulation (para.16c(1)(a), Part IV, Manual for Courts–Martial, United States (1995 ed.)) and is presumed to be lawful, appellant has the burden to establish otherwise. *See United States v. Austin*, 27 MJ 227, 231–32 (CMA 1988); *United States v. Bayhand*, 6 USCMA 762, 768, 21 CMR 84, 90 (1956); *see also* paras. 16c(1)(c) and 14c(2)(a)(i), Part IV, Manual, *supra*.

The Manual for Courts–Martial provides the following test for assessing the lawfulness of a general order or regulation: [2]

> The order must relate to military duty, which includes all activities reasonably necessary to accomplish a military mission, or safeguard or promote the morale, discipline, and usefulness of members of a command and directly connected with the maintenance of good order in the service. The order may not, without such a valid military purpose, interfere with private rights or personal affairs.... Disobedience of an order ... which is given for the sole purpose of increasing the penalty for an offense which it is expected the accused may commit, is not punishable under this article.

*See United States v. Blye*, 37 MJ 92, 94–95 (CMA 1993), quoting this paragraph.

The military judge found that the regulation served a number of valid purposes, including enhancing productivity by reducing the amount of time servicemembers would spend in finance offices dealing with travel claims. He found also that, under the exclusive agreement between American Express and the U.S. Government, the card could be used only for "official travel and travel-related expenses." He found further that American Express provided a line of credit for which the Government would assume no liability and that, as part of the consideration to American Express for doing so, the Government agreed to restrict access to authorized users and to provide "timely reimbursement" to servicemembers for authorized use.

---

**2.** This is quoted from paragraph 14c(2)(a)(iii), Part IV, Manual for Courts–Martial, United States (1995 ed.), which applies to Article 92 through paragraph 16c(1)(c).

The military judge found that NAFBR 111–2 promoted "the efficient administration" of the program by controlling use. He also found that the 25–day payment requirement, while shorter than the time required by American Express, "aids in preventing delinquent accounts, and ... disruption to the efficient accomplishment of military duties...."

Based upon these findings, the military judge concluded that the regulation was "a permissible exercise of command function ... inextricably intertwined with military duties and directly connected to the good order of the service and avoiding discredit to the armed service." He also concluded that the regulation "does not unnecessarily interfere with the accused's private rights or personal affairs. Even if one agrees that it is a private and voluntary agreement, it is clearly for a public military purpose." The military judge observed that the regulation provided a valid means of "facilitating government business and deployment activities" and ensuring the "financial health and well-being" of servicemembers, "especially when it relates to expenses incurred and to be reimbursed specifically for government duties."

In addition, he concluded that the regulation's "sole purpose or effect" was not to "increase the punishment" for failure to pay just debts because the regulation was designed "to proscribe other narrower and limited conduct, that of not timely paying an obligation for which reimbursement is provided involving military duties." Finally, he concluded that the regulation was "specific and certain and not otherwise contrary to established law or custom."

### III

■ Appellant has not demonstrated that the factual findings of the military judge are incorrect or otherwise are "clearly erroneous" under applicable standards of review, and he has not provided us with a basis to disagree with the conclusions of law reached by the military judge. Indeed, we agree with the military judge that the regulation is a lawful exercise of the powers of a military commander.

■ To the extent that appellant has alleged deficiencies in the administration of the program or has suggested alternative means of providing funds for travel that would not rely upon issuance of credit cards to servicemembers, those are issues to be addressed by appropriate policy makers. The lawfulness of an order governing the financial-accounting aspects of official travel does not depend on a showing that the command has selected the best possible management tool, *see generally United States v. Stevenson,* 21 USCMA 426, 427, 45 CMR 200, 201 (1972), or that the commander has chosen a program that is the least restrictive alternative in terms of impact on the individual servicemember. On the contrary, military officials have broad authority to structure, test, and restructure finance and accounting activities in an effort to obtain improved efficiencies and economies in the conduct of military affairs.

■ Should any such program contain deficiencies that adversely affect the ability of an individual to comply with applicable regulations, an accused in a court-martial has the opportunity to assert appropriate defenses. This is not such a case. Appellant conceded that he knew of the restrictions on his use of the card, both from the agreement that he signed and from the briefing on the card provided by his unit. Nonetheless, over a period of several months he went on a spending spree of unauthorized uses of the card totaling over $11,000.00. When billed by American Express for these charges, none of which appellant has disputed, he not only did not pay them in full within the time required by the regulation, he made no payments at all. He has not demonstrated that his improper use of the card or his failure to make the payments was caused by any deficiency in the structure of the program or the wording of the regulation.

Under these facts, appellant is not positioned to urge, as he has, such potential difficulties with the regulation as might be posed, for instance, by a member who disputes a charge or one who is not timely reimbursed by the Government. Those

hypothetical arguments await a real-life defendant so situated; for appellant, they remain hypothetical.

## IV

The decision of the United States Air Force Court of Criminal Appeals is affirmed.

Chief Judge COX and Judges CRAWFORD and GIERKE concur.

SULLIVAN, Judge (concurring):

I agree with my Brother's resolution of this case and write only to express my deep concern for this particular type of crime—the misuse of a government American Express card.

The military-justice system is seeing too many of these cases. Perhaps the wisdom of this government program should be reevaluated in light of the ease and trend for members of our armed forces to misuse these credit cards. Opportunity to steal may make a thief. Is there a government duty to avoid a program that is so prone to misuse? There is a crime here. There also may be a leadership failure. Giving a credit card to people—young, immature, and inexperienced to financial responsibility or pressed by financial pressures or emotional problems— may be an irresponsible act.

Having said all this, I would affirm the conviction in this case. The policy of the American Express cards may be a problem, but it is one for the Executive, not the Judicial, Branch. As Justice Oliver Wendell Holmes, Jr., once remarked in a discussion with Solicitor General John W. Davis when told that many more Sherman Anti–Trust Act cases were headed for the Supreme Court:

> Well, bring ém on and we'll decide them. Of course I know, and every sensible man knows, that the Sherman [Anti–Trust] Law is damned nonsense, but if my country wants to go to hell, I am here to help it.

W. Harbaugh, *A Lawyer's Lawyer: The Life of John W. Davis* (Oxford University Press), quoted in *United States v. Sumrall,* 45 MJ 207, 211 n. 3 (1996).