**UNITED STATES, Appellee,**

**v.**

**Jerry A. PALMITER, Airman U.S. Navy, Appellant.**

**No. 46046.**
**NMCM 82 5410.**

U.S. Court of Military Appeals.

May 28, 1985.

For Appellant: *Lieutenant Colonel M. W. Lucas, USMC* (argued); *Commander G. Sid Smith, JAGC, USN*, and *Lieutenant Commander William A. DeCicco, JAGC, USN*.

For Appellee: *Lieutenant J. K. Ianno, JAGC, USNR* (argued); *Captain W. J. Hughes, JAGC, USN*, and *Commander Richard A. Monteith, JAGC, USN* (on brief).

*Opinion*

COX, Judge:

On his provident pleas of guilty, appellant was convicted of missing the movement of his ship through neglect and an unauthorized absence of slightly over 9 months' duration, in violation of Articles 87 and 86, Uniform Code of Military Justice, 10 U.S.C. §§ 887 and 886, respectively. A special court-martial military judge sitting alone sentenced appellant to 90 days' confinement at hard labor, partial forfeitures, reduction to the lowest enlisted grade, and a bad-conduct discharge. The convening and supervisory authorities approved the findings and sentence; the Court of Military Review affirmed.

We granted appellant's petition for review to consider the following issues raised by him:

I

DOES ARTICLE 13, U.C.M.J., ALLOW MILITARY CONFINEMENT FACILITY OFFICIALS TO SEEK WAIVERS

FROM PRETRIAL DETAINEES OF THE RIGHT NOT TO ACCEPT CONDITIONS OF A SENTENCED PRISONER?

II

IF THE ANSWER TO ISSUE I IS AFFIRMATIVE, DID THE NAVY'S WORK PROGRAM REQUEST FORM FOR PRETRIAL DETAINEES ADEQUATELY APPRISE APPELLANT HE WAS WAIVING A STATUTORY RIGHT TO BE SEGREGATED FROM SENTENCED PRISONERS, DID IT ELICIT VOLUNTARY ACCEPTANCE, AND DID THE CIRCUMSTANCES OF EXECUTING THAT FORM DEMONSTRATE AN INFORMED, VOLUNTARY WAIVER?

In addition, upon consideration of the facts of the case, we specified the following issue:

WHETHER THE SPECIFICATION OF CHARGE II (MISSING MOVEMENT) IS MULTIPLICIOUS WITH THE SPECIFICATION OF CHARGE I (ABSENT WITHOUT AUTHORITY).

Finding no error prejudical to appellant's substantial rights, we affirm.

Throughout these proceedings appellant has contended that he was subjected to punishment prior to trial, in violation of Article 13, UCMJ, 10 U.S.C. § 813, because he was placed in the general population of the confinement facility with sentenced prisoners. Prior to entering his pleas, appellant moved that the trial court grant him appropriate relief, challenging the conditions of his confinement. He requested administrative credit towards any sentence should he be convicted. He now asks this Court to set aside the bad-conduct discharge since he has fulfilled his active sentence requirements and credit for pretrial detention would be a meaningless remedy.

Following his return to military control, appellant was first placed in pretrial confinement on his ship, then transferred to the Brig at Naval Station, Treasure Island, California. He was seen by a military magistrate, who determined that confinement was necessary to ensure appellant's presence at trial.[1] Appellant remained in pretrial confinement until the date of his trial.

For purposes of the motion, the Government admitted that appellant was initially placed in a single cell about 6–feet by 7–feet, with a desk, toilet, chair, and bed. He was only allowed to wear his undershorts, and to either sit at the desk or stand from 0400 hours to 2200 hours. His only reading materials were a Bible and the brig regulations. He was not allowed to write or receive letters, lie on the bed between reveille and taps, or communicate with other prisoners.[2]

This regime continued for two days whereupon appellant was released to the

1. The record does not disclose whether appellant appeared before a military magistrate prior to entering the brig on his ship, the USS CORAL SEA (CV–43), or while at the Naval Station Brig, Treasure Island, California.

2. The conditions of appellant's initial detention were stark. However, it appears that he was treated in a manner similar to all incoming prisoners. We recognize that segregation may be necessary if for no other reason than to insure communicable diseases are not introduced into the facility as well as to determine whether an incoming prisoner might pose a danger to himself or others. These conditions are related to a rational custodial purpose: the evaluation, classification, and examination of newly received prisoners about whom the correctional and medical staff know little or nothing. The Secretary of Defense and the service secretary concerned, in this case the Secretary of the Navy, have promulgated regulations for the reception and classification of newly received prisoners. Department of Defense Instruction (DOD Inst) 1325.4 (Oct. 7, 1968); Secretary of the Navy Instruction (SECNAVINST) 1640.9 §§ 403.2, 505.4, and 506.2 are the relevant regulations and have been issued under a grant of authority from Congress contained in 10 U.S.C. §§ 951–55. However, the record before us fails to establish the necessity of prohibiting a detainee from corresponding with anyone outside the facility, depriving him of his uniforms, or restricting reading materials permitted other confinees. We do not decide here whether a detainee could be restricted from contacting his attorney during such administrative segregation.

general population of the brig. In the interim appellant had executed a form denominated a "Work Program Request." This form states appellant's understanding that persons who are detained awaiting trial (as well as those awaiting initial action on their courts-martial) "will not be required to observe working hours in excess of the normal station" duty hours or to be assigned to "hard labor" details being performed by sentenced prisoners. The form specifically notes that a detainee may be intermixed with sentenced prisoners for formations, meals, classroom instruction, and routine details normally performed by *all* service members and necessary for the maintenance of the facility and grounds, "which are not ordered as punishment." Lastly the form advises a detainee that he must agree in writing "to participate in the ... full work program" of the brig, and states appellant's willingness to "volunteer for" such assignments.[3] Appellant complains that his execution of the waiver could not be construed as voluntary since the only choices he had were the starkness of solitary confinement or executing the waiver.

While awaiting trial, appellant worked from 0700 hours to 1530 hours, the normal duty hours of all confinees. His work seems to have consisted of routine maintenance of the facility as provided for in appropriate service directives. Appellant was quartered with, and wore essentially the same uniform as, sentenced prisoners, the only distinguishing mark being the color of tape on the identification badge for each prisoner.

Article 13 of the Code prohibits "punishment or penalty other than arrest or confinement upon the charges pending against" an accused who is awaiting trial. It further states that the conditions of the arrest or confinement shall be no more rigorous than that necessary to secure his presence for trial. The President expanded on the terms of this Article by providing that "[p]risoners being held for trial shall not be required to undergo punitive duty hours or training, perform punitive labor, or wear special uniforms prescribed only for post-trial prisoners."[4] Para. 18(b)(3), Manual For Courts-Martial, United States, 1969 (Revised edition).

In an early case involving charges of disobeying orders while in pretrial confinement, we had occasion to apply the strictures of Article 13. In *United States v. Bayhand*, 6 U.S.C.M.A. 762, 21 C.M.R. 84 (1956), Bayhand, a pretrial confinee, had been assigned to work details with prisoners who were serving sentences to confinement at hard labor. These details included working in a ditch with a pick and shovel, and carrying heavy rocks in a wheelbarrow at a quarry. He refused to comply with certain orders relating to these tasks and was charged with willful disobedience under Articles 90 and 91, UCMJ, 10 U.S.C. §§ 890 and 891. We held that the orders given to him were illegal as a matter of law because he was treated the same as sentenced prisoners in terms of confinement conditions, uniforms, hours of duty, and types of work assigned, and thus he was being punished prior to trial in violation of Article 13 of the Uniform Code.

In reaching this conclusion, we examined the legislative history of Article 13 and the writings of early military law scholars, *see* Hearings on H.R. 2498 Before a Subcomm. of the House Armed Services Comm., 81st Cong., 1st Sess. 916–17, *reprinted in Index and Legislative History, Uniform Code of Military Justice* (1949); G. Davis, *A Trea-*

3. Unlike the waivers before us in other recent cases which were locally prepared forms, the work-program request was taken verbatim from Appendix A-9, SECNAVINST 1640.9, the Corrections Manual, Department of the Navy. As such, it has been considered and approved by a department-level officer.

4. This is a problem peculiar to military criminal law not only due to the lack of bail in the military, but also because no civil remedy exists for military members confined awaiting trial. Such claims are not cognizable under the Civil Rights Act, 42 U.S.C §§ 1983 and 1985, or the Federal Tort Claims Act, 28 U.S.C. §§ 1346 and 2671 et seq. *Chappell v. Wallace*, 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983); *cf. Feres v. United States*, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950).

*tise on the Military Law of the United States* 485 (3d ed. 1913); W. Winthrop, *Military Law and Precedents* 124–25 (2d ed. 1920 Reprint), all of which evidenced a clear intent to prohibit punishment by the imposition of hard labor upon a pretrial confinee.

In succeeding cases, we have held that a pretrial confinee who has been forced to work with sentenced prisoners was being punished without regard to the type of work involved. *See United States v. Pringle,* 19 U.S.C.M.A. 324, 41 C.M.R. 324 (1970); *United States v. Nelson,* 18 U.S.C.M.A. 177, 39 C.M.R. 177 (1969). In reaching this conclusion, we rejected the argument that there was no punishment if the work being performed was no more rigorous than that done by non-confinees; instead, we looked at whether the pretrial confinee was performing work details in company with sentenced prisoners. We consequently decided that if a pretrial confinee was working with prisoners who had been sentenced to perform hard labor, then—by definition—he, too, was performing hard labor and, hence, was being punished in violation of Article 13 of the Code. This syllogism was consistent with the historical view of "hard labor," and evolved into the concept of "commingling." [5]

The problem with this historical analysis is that the "hard labor" as envisioned by Congress in 1949,[6] and by the early military writers, is no longer being performed in military correction/confinement facilities, not even as punishment. Therefore, it seems apparent that a fresh look at the present conditions of confinement in terms of Article 13 is necessary.

We begin, as we did before, with the stricture that pretrial punishment is prohibited except to enforce internal confinement discipline. We recognize, however, that a pretrial confinee may be required to perform useful labor because he remains on active duty as a full-duty serviceman. In addition, we perceive no necessity to deprive pretrial confinees of the programs and recreational facilities available to other prisoners. On the other hand, we also recognize that the reasons for imposing pretrial confinement create a special problem for the confinement personnel because it would be illogical to assign a pretrial confinee to duties outside the facility when the pre-existing reason for his pretrial confinement is to ensure against his flight to avoid trial or to prevent the commission of further offenses. Given the limited facilities and programs available at most installations, the total separation of pretrial confinees from the general population of confinement facilities might well result in imposition of much harsher conditions than those imposed upon some prisoners who have been sentenced to hard labor. We cannot believe that such an illogical and anomalous result is necessary or was intended by Congress.

The *Bayhand-Nelson-Pringle* trilogy does not represent the only changes effected by this Court. To minimize possible prejudice to an accused in pretrial confinement, we created a presumption of prejudice whenever a serviceperson is confined for more than 90 days while awaiting trial. *See United States v. Burton,* 21 U.S.C.M.A. 112, 44 C.M.R. 166 (1971).[7] In *Courtney v. Williams,* 1 M.J. 267 (C.M.A. 1976), we directed the military services to provide each pretrial confinee with a hear-

5. Judge Darden concurred specially in *Nelson* on the basis that the commander concerned had determined that sentenced and unsentenced prisoners should not be assigned to the same work details or the same types of details. He was of the opinion that commingling did not constitute punishment *per se.*

6. The committee hearings refer specifically to "rock-breaking." Hearings on H.R. 2498 Before a Subcomm. of the House Armed Services Comm., 81st Cong., 1st Sess. 917, *reprinted in Index and Legislative History, Uniform Code of Military Justice* (1949).

7. We also recognized that the conditions causing the accused to be confined in excess of 90 days must be taken into account, *United States v. Marshall,* 22 U.S.C.M.A. 431, 47 C.M.R. 409 (1973), as well as the fact that a military accused may be denied a speedy trial where his pretrial confinement is less than 90 days. *United States v. Rowsey,* 14 M.J. 151 (C.M.A. 1982).

ing before a neutral and detached officer who was responsible for determining whether probable cause existed to believe that the confinee had committed an offense and that confinement was required to ensure the confinee's presence at trial.[8] Finally, we have directed that pretrial confinees must receive credit against any sentence to confinement at hard labor for time spent in pretrial confinement. *United States v. Allen,* 17 M.J. 126 (C.M.A. 1984).

In addition, we must take cognizance of the Supreme Court's decision in *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Starting with the same premise prohibiting punishment prior to trial, the Court decided that the question of whether particular conditions amount to punishment before trial is a matter of intent, which is determined by examining the purposes served by the restriction or condition, and whether such purposes are "reasonably related to a legitimate governmental objective." *Id.* at 539, 99 S.Ct. at 1874. The Court noted:

> [I]n the absence of a showing of intent to punish, a court must look to see if a particular restriction or condition, which may on its face appear to be punishment, is instead but an incident of a legitimate nonpunitive governmental objective.

*Id.* at 539 n. 20, 99 S.Ct. at 1874 n. 20, *citing Kennedy v. Mendozo-Martinez,* 372 U.S. 144, 168, 83 S.Ct. 554, 567, 9 L.Ed.2d 644 (1963); and *Flemming v. Nestor,* 363 U.S. 603, 617, 80 S.Ct. 1367, 1376, 4 L.Ed.2d 1435 (1960).

While *Bell v. Wolfish, supra,* does not specifically address the problem of commingling prisoners, the analysis is apposite. A facial examination of the pretrial-confinement conditions imposed on this pretrial confinee would appear, in certain instances, to violate our proscription against commingling; however, the record discloses no evidence of improper intent by confinement officials in placing him with sentenced prisoners for the purposes indicated. He did not work on hard-labor details, and his association with sentenced prisoners was limited to casual contacts while he was performing work necessary for the operation of the facility.

Taken collectively the commendable changes in conditions in confinement facilities effected by the military services, the enforcement of speedy-trial requirements, and the due-process hearings to determine the necessity for pretrial confinement have reduced the likelihood of a recurrence of the conditions condemned in *United States v. Bayhand, supra.*

We have not hesitated to reconsider earlier decisions when conditions necessitating such broad measures have abated.[9] Our prior decisions applied the test of commingling in an inflexible manner. As *Bell v. Wolfish, supra,* has made clear, the mere fact of confinement is not tantamount to punishment, and we must look to the intent behind imposition of the condition to resolve the punishment inquiry. While not retreating from those principles which have guided us in the past, the time has come to formulate new guidelines. Henceforth, in my opinion, the question to be resolved is not solely whether a pretrial confinee was commingled with sentenced prisoners, but, instead, whether any condition of his confinement was intended to be punishment.

Turning to the instant case, it is apparent that appellant did not suffer punishment prior to trial. He did not serve on details with those performing "hard labor"

8. This latter facet has been expanded to include situations where the particular accused poses a danger to others, particularly to those who might testify against him in a future court-martial. *See* R.C.M. 305(h)(2)(B)(iii)(b), Manual for Courts-Martial, United States, 1984.

9. In his well-considered opinion in *United States v. Morrison,* 12 M.J. 272 (C.M.A. 1982), Chief Judge Everett noted several instances of such rules which subsequently became unnecessary because of the passage of time and the compliance of the military services. Specifically, he noted that the doctrines of general prejudice as well as the presumption of prejudice attaching to the failure of the officer exercising general court-martial jurisdiction to review a conviction within 90 days were abandoned when the Court became convinced that they were outmoded or no longer necessary. *Id.* at 278–79.

adjudged as a court-martial sentence. There is no evidence that any particular duty was assigned to him to extract a measure of retribution. The record discloses that if he had expressed a desire not to continue working under the conditions set by the confinement officials, he would have been placed on a detail without sentenced or adjudged prisoners. Because commingling *per se*, without more, does not constitute punishment, Palmiter did not suffer a violation of his Article 13 rights by the conditions of his confinement. The decisions of the military judge and the Court of Military Review in this regard are correct.

It is noted that Chief Judge Everett equates "commingling" with punishment, making the analogy that because Article 12, UCMJ, 10 U.S.C. § 812, specifically prohibits the intermixture of prisoners of war with our own prisoners, this implies that a prisoner may be demeaned by the very fact of being associated with a distinctly different class of prisoners. The legislative history of Article 13 does not support this implication. Indeed, the fact that Article 12 is explicit on this point and Article 13 is silent implies to me that Congress did not envision commingling to be punishment. The evil Congress intended to prevent was use of pretrial confinement as punishment without benefit of trial. The argument could be advanced, depending on the factual circumstances, that segregation from sentenced prisoners constitutes punishment. For example, if a confinement facility has limited pretrial facilities, but provides recreational and educational facilities only to its sentenced prisoners, I am not willing to adopt a *per se* prohibition against commingling. It is but a factor to consider in determining whether or not the pretrial prisoner has been punished.

In passing, it should be noted that a prisoner cannot "waive" his Article 13 protections prior to trial because no one can consent to be treated in an illegal manner. Nevertheless, the use of "Work Program Request" forms, which Chief Judge Everett equates with the doctrine of waiver, is certainly appropriate to inform the pretrial detainee of what is available to him in pretrial confinement and to document his understanding and agreement. This is a far cry, however, from "waiving" his Article 13 protections. It is merely an acknowledgment of the detainee's understanding of the conditions of his incarceration.[10]

*Under no circumstance* should the prisoner be the one to dictate the terms and conditions of his confinement. This should always be left up to the correctional facility commanders and the respective services.

Resolution of the instant case does not end our consideration of the problem before us. Assertion of illegal conditions of confinement is commonly made after the fact. If an accused is acquitted of the then-pending charges, he has no remedy because he may not extract civil damages either from his jailor or the person ordering his confinement. *See Chappell v. Wallace,* 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983); *cf. Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950). Neither the Government nor a pretrial confinee benefits from the present system which provides no immediate forum to determine the legality of the conditions of pretrial confinement. The military magistrate systems created by the services in response to *Courtney v. Williams, supra,* are ideally suited to review the conditions of pretrial confinement as well the need for pretrial confinement at the same hearing. Henceforth, when considering whether a pretrial confinee has suffered punishment in the sense of Article 13, the magistrate should look not only to the factors detailed in *United States v. Bayhand* and *United States v. Nelson,* both *supra,* but also to other conditions as well. Among those matters impacting on the resolution of the issue are the age and physical condition of the confinement facility, the numbers and classes of prisoners

10. In this regard we note with approval the action of the Secretary of the Navy in formulating a service-wide work program request for his correctional facilities. Such written notice of the conditions of confinement to a detainee reduces the initial shock of confinement.

therein, the actual ability of the confinement officials to segregate or intermix confinees from adjudged or sentenced prisoners, as well as the impact of totally separating confinees from the general population.[11]

If, after the initial hearing and determination by the military magistrate, a confinee believes that he is being punished by conditions in the confinement facility, he should apply for relief from these conditions to the magistrate who initially approved his pretrial confinement. Should he be denied relief by that magistrate, the confinee should appeal to the convening authority or to the military judge depending on the state of the proceedings at the time. It is possible that resort to the extraordinary-writ jurisdiction of the appellate courts would be appropriate in extreme cases.[12] Just as with the decision to continue pretrial confinement, review of the conditions of such confinement should be an ongoing process to limit the duration of any violation which might arise following the initial incarceration. The failure to raise this issue while undergoing pretrial confinement will be strong evidence that the confinee was not illegally punished prior to trial.

The decision of the United States Navy-Marine Corps Court of Military Review is affirmed.[13]

Judge FLETCHER did not participate.

EVERETT, Chief Judge (concurring in the result):

I

I concur with Judge Cox that, because the length of appellant's unauthorized absence was of more than a "minimal duration," it was not included in the specification alleging missing movement; and, therefore, no multiplicity existed for findings. *United States v. Murray,* 17 M.J. 81 (C.M.A. 1983).

With respect to pretrial confinement, I agree that the military magistrate should have a responsibility not only to decide whether pretrial confinement is appropriate but also to determine whether impermissible conditions of confinement have been imposed. Thus, a servicemember in pretrial confinement who believes the conditions are unduly onerous may apply for relief from the same official who is authorized to determine whether he should be in confinement.

II

As to the criteria for testing whether improper conditions of pretrial confinement have been imposed, I differ somewhat from Judge Cox. Article 13, Uniform Code of Military Justice, 10 U.S.C. § 813, provides:

> No person, while being held for trial, may be subjected to punishment or penalty other than arrest or confinement upon the charges pending against him, nor shall the arrest or confinement imposed upon him be any more rigorous than the circumstances require to insure his presence, but he may be subjected to minor punishment during that period for infractions of discipline.

Early in this Court's history we held, on the basis of Article 13 and a painstaking examination of its legislative history, that a

**11.** It may well be that in a given situation with a minimal number of pretrial detainees in a brig, segregation itself would amount to a violation of Article 13, Uniform Code of Military Justice, 10 U.S.C. § 813. A factfinder on the scene is best able to evaluate the particular situation and determine the subjective intent of those charged with operation of the facility in their treatment of a given prisoner.

**12.** In the Army, for example, judges assigned to the U.S. Army Judiciary exercise supervisory authority over military magistrates, *see* para. 9–2*e*, AR 27–10. We would assume that the decision of a magistrate adverse to a detained member could be appealed to that level, with ultimate review at trial prior to seeking extraordinary relief.

**13.** I have examined the specified issue and find it to be without merit. Appellant's absence was not of a "minimal duration" and, thus, is not "fairly embraced" within an allegation of missing movement. *Cf. United States v. Murray,* 17 M.J. 81 (C.M.A. 1983); *see United States v. DiBello,* 17 M.J. 77 (C.M.A. 1983).

pretrial detainee could not be compelled to perform work details with prisoners who had been sentenced to confinement at hard labor. *United States v. Bayhand,* 6 U.S.C. M.A. 762, 21 C.M.R. 84 (1956). The Court reasoned:

> From the foregoing, the conclusion is inescapable that Congress, the framers of the Manuals for Courts-Martial, and the Army must have recognized that gross injustices might result from any confinement system in which one accused of crime was treated no better than one proved guilty.

*Id.* at 768, 21 C.M.R. at 90.

Probably in Bayhand's day, most prisoners who were sentenced to hard labor during confinement actually performed such hard labor. However, even if sentenced prisoners now usually do no more than routine duties while in confinement, I do not believe that this justifies commingling pretrial detainees with sentenced prisoners. Indeed, this Court's decisions in *United States v. Pringle,* 19 U.S.C.M.A. 324, 41 C.M.R. 324 (1970), and *United States v. Nelson,* 18 U.S.C.M.A. 177, 39 C.M.R. 177 (1969), so held, when the Court opined that, if a pretrial detainee was performing the same work as a prisoner sentenced to confinement at hard labor, then by definition the detainee was being punished with hard labor in violation of Article 13, regardless of the tasks actually being performed.

While I agree substantially with this conclusion, my rationale is somewhat different, for I interpret Article 13's proscription of "punishment or penalty other than arrest or confinement" as concerning more than the nature of the work required of pretrial detainees, when compared to that of sentenced prisoners. Therefore, commingling of pretrial detainees and sentenced prisoners on work parties may be illegal even when the task involved is far less onerous than breaking rocks.

In this connection, I note that Article 12 admonishes that "[n]o member of the armed forces may be placed in confinement *in immediate association* with enemy prisoners or other foreign nationals not members of the armed forces." (Emphasis added.) Whatever the factors underlying this prohibition, Article 12 seems to recognize that a prisoner may have a legitimate interest in being confined apart from persons who are in a distinctively different class of prisoners. Sometimes this interest may concern physical safety. On other occasions, it may exist because the close association with that class of prisoners would be demeaning in some way.

When pretrial detainees—who have been charged with or have not been proven guilty of any crime—are placed in immediate association with sentenced prisoners for work or some other required activity, this close association occasionally will involve enhanced danger to physical safety. Typically, it will tend to stigmatize the pretrial detainees; and the intentional imposition of stigma is itself a punishment, as the Uniform Code recognizes by authorizing punitive discharges that are characterized as "dishonorable" or "bad-conduct." Therefore, when a pretrial detainee is involuntarily placed "in immediate association" with prisoners already convicted and sentenced, this stigma-by-association usually should be considered "punishment or penalty other than arrest or confinement" in contravention of Article 13.[1]

III

Apart from Article 13's proscription, a pretrial detainee is constitutionally protected against "punishment": "For under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Bell v. Wolfish,* 441 U.S. 520, 535, 99 S.Ct. 1861, 1872, 60 L.Ed.2d 447 (1979) (footnote omitted), and cases cited therein. This is not to

1. The Supreme Court's decision in *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), provides some constitutional guidelines as to conditions of pretrial detention. However, it is not determinative as to congressional intent in enacting Article 13, Uniform Code of Military Justice, 10 U.S.C. § 813.

say, of course, that a detainee may not properly be subjected to a significant loss of freedom, for "[o]nce the Government has exercised its conceded authority to detain a person pending trial, it obviously is entitled to employ devices that are calculated to effectuate this detention." *Id.* at 537, 99 S.Ct. at 1873.

In determining whether a specific restriction falls within proscribed "punishment" or within permissible "regulatory restraints," *id.*, "[a] court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. *See Flemming v. Nestor*, ... [363 U.S. 603] at 613–617 [80 S.Ct. 1367, at 1373–1376, 4 L.Ed.2d 1435]." *Id.* 441 U.S. at 538, 99 S.Ct. at 1873. The Court gave the following guidance on how the purpose of a restriction is to be divined:

> Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on "whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]." *Kennedy v. Mendoza-Martinez,* 372 U.S. [144], at 168–169 [83 S.Ct. 554, at 567–568, 9 L.Ed.2d 644 (1963)]; *see Flemming v. Nestor, supra,* [363 U.S.] at 617 [80 S.Ct. at 1376]. Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees. *See ibid.*

441 U.S. at 538–39, 99 S.Ct. at 1873–74 (footnotes omitted).

Applying this standard to appellant's pretrial confinement, I agree fully that segregating new prisoners—including pretrial detainees—is "reasonably related to a legitimate governmental objective" of evaluating, classifying, and examining "newly received prisoners about whom the correctional and medical staff know little or nothing." 20 M.J. 90, 92 n. 2. Moreover, ensuring that newly arrived prisoners learn the prison regulations under which they will be expected to live is " 'an alternative purpose to which [the restriction (in reading material to a Bible and prison regulations—at least for a reasonable period of time)] may rationally be connected ...' " Neither of these restrictions " 'appears excessive in relation to the alternative purpose assigned [to it].' " *See Bell v. Wolfish, supra* 441 U.S. at 538, 99 S.Ct. at 1873.

However, this is not all that was involved here. As mentioned by Judge Cox:

> For purposes of the motion, the Government admitted that appellant was initially placed in a single cell about 6–feet by 7–feet, with a desk, toilet, chair, and bed. *He was only allowed to wear his undershorts, and to either sit at the desk or stand* from 0400 hours to 2200 hours. His only reading materials were a Bible and the brig regulations. *He was not allowed to write or receive letters, lie on the bed between reveille and taps, or communicate with other prisoners.*

20 M.J. at 92 (emphasis added; footnote omitted). Some of these conditions are far more onerous than would be required to assure the detainee's presence and so they violated Article 13. Regardless of the restrictions that might be imposed on sentenced prisoners without violating Article 55, UCMJ, 10 U.S.C. § 855, it is hard to see why a pretrial detainee should be prohibited from corresponding with persons outside the facility, such as his lawyers, family, or friends; or be required to be only in undershorts and in the daytime to sit or stand, rather than to lie in bed. No "alternative purpose" which seems reasonably related to a legitimate

governmental objective "is assignable for" these conditions.[2]

IV

A

Although in my view, Article 13 generally prohibits commingling pretrial detainees with sentenced prisoners, I see no reason to conclude that an accused cannot waive this protection. Article 13 contains no explicit provision for waiver, *see United States v. Bruce*, 14 M.J. 254 (C.M.A. 1982); but it also does not reveal any legislative intent to prohibit a waiver of the rights bestowed. Indeed, if a servicemember or other citizen can waive some of his most important constitutional rights—such as confrontation and the presumption of innocence—why should he be precluded from waiving his Article 13 protection? To me, the "request" form executed by Palmiter seems indistinguishable from waiver.

The conclusion that a servicemember is free to waive his protections under Article 13 is especially persuasive because sometimes there are obvious benefits for him to derive from such a waiver. For instance, in small stockades where only one or two persons may be in pretrial confinement, segregation of a pretrial detainee from sentenced prisoners might amount to "solitary confinement." Furthermore, most confinement facilities have limited custodial manpower; and if persons in pretrial confinement must work and have recreation apart from sentenced inmates, there may not be enough prison guards to supervise both groups separately. The result may be that work, recreation, and other activities which are usually considered rehabilitative cannot be provided for the relatively small number of pretrial detainees. Consequently, a person in pretrial confinement might willingly waive any right to be separated from sentenced prisoners, rather than to have a lonely, inactive existence.

In view of the negative practical results from interpreting Article 13 to prohibit waivers, I conclude that Congress must have intended that pretrial detainees may execute valid waivers of their statutory right to be segregated from sentenced prisoners and that, pursuant to such a waiver, pretrial detainees may be placed in immediate association with sentenced prisoners and may participate in work assignments with them.

B

I recognize, however, the danger that, because it is more convenient for correctional officials to have all inmates confined and working together, such officials may be tempted to create unduly onerous conditions for pretrial detainees in order to "encourage" a waiver of their Article 13 rights. In view of the military judge's ruling, I shall assume that in this case correctional officials were not creating impermissible conditions of confinement for this improper purpose, although some circumstantial evidence points in the opposite direction.

V

Appellant, who was convicted of a 9–month unauthorized absence and missing movement of his vessel, was sentenced to a bad-conduct discharge, confinement at hard labor for 90 days, forfeiture of $366.00 pay per month for 5 months, and reduction to pay grade E-1. The bad-conduct discharge which the court-martial adjudged was specifically requested by Palmiter when he testified in extenuation and mitigation. The confinement presumably has been served long ago.

While I conclude that initially Palmiter was confined before trial under conditions that were unduly onerous and so in viola-

2. In arriving at this conclusion, I have heeded the Supreme Court's warning that "[s]uch considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Bell v. Wolfish, supra* 441 U.S. at 547–48, 99 S.Ct. at 1878–79, quoting *Pell v. Procunier*, 417 U.S. 817, 827, 94 S.Ct. 2800, 2806, 41 L.Ed.2d 495 (1974).

tion of Article 13, the only meaningful remedial action to which he might be entitled would be reassessment of the forfeitures because of the impermissible conditions of the pretrial confinement to which he was briefly subjected. Taking all the circumstances of the case into account, I cannot justify delaying final disposition and execution of appellant's requested punitive discharge in order to allow reassessment of the forfeitures by the Court of Military Review. Believing that it is now in the interest of justice to affirm the findings and sentence, I concur in the result.